In the

# United States Court of Appeals
### For the Seventh Circuit

No. 14-1898

WAYNE KUBSCH,

*Petitioner-Appellant*,

*v.*

RON NEAL, Superintendent,
Indiana State Prison,[1]

*Respondent-Appellee*.

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:11CV42-PPS — **Philip P. Simon**, *Chief Judge*.

ARGUED FEBRUARY 10, 2015 — DECIDED AUGUST 12, 2015

Before WOOD, *Chief Judge*, and TINDER and HAMILTON,
*Circuit Judges*.

---

[1] We have substituted as respondent-appellee Ron Neal, the current
Superintendent of the Indiana State Prison, for Bill Wilson, the former
Superintendent. See Fed. R. App. Pro. 43(c)(2).

HAMILTON, *Circuit Judge*. Wayne Kubsch appeals the denial of his habeas corpus petition. After being convicted of murdering his wife, her son, and her ex-husband, Kubsch was sentenced to death. Kubsch's three principal arguments on appeal are that his conviction and sentence are unconstitutional because (a) the Indiana trial court excluded evidence of a witness's exculpatory but hearsay statement to police, (b) he was denied effective assistance of counsel in seeking admission of the witness's hearsay statement, and (c) his waiver of counsel and choice to represent himself at the sentencing phase of his trial were not knowing and voluntary.

We reject all three claims. Kubsch argues for a constitutional right to defend himself with otherwise inadmissible hearsay, at least if the hearsay seems sufficiently reliable and is sufficiently important to his defense. See *Chambers v. Mississippi*, 410 U.S. 284, 300–02 (1973). Kubsch's evidence is not sufficiently reliable to fit that narrow constitutional exception and to have required Indiana courts to disregard long-established rules against using *ex parte* witness interviews as substantive evidence at trial. His able trial counsel tried hard to have the statement admitted; they were not successful but also were not constitutionally ineffective.

As for the waiver of counsel claim, the Indiana Supreme Court rejected the claim in a careful discussion tailored to the facts of this case. Its rejection of the claim was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. See 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011).

In addition to the exculpatory hearsay claim, the related ineffective assistance claim, and the waiver of counsel claim

that we address in detail, Kubsch raises a number of other arguments on appeal, all of which are challenges to the effectiveness of his counsel. We have considered all of these additional arguments, and we reject them for the reasons Chief Judge Simon explained in his thorough opinion. See *Kubsch v. Superintendent*, No. 3:11CV42–PPS, 2013 WL 6229136 (N.D. Ind. Dec. 2, 2013). Accordingly, we affirm the denial of relief as to both Kubsch's convictions and the death sentence.

I. *Factual and Procedural Background*

　　A. *Court Proceedings*

The State of Indiana charged Kubsch with murdering Beth Kubsch, Aaron Milewski, and Rick Milewski: his wife, her son, and her ex-husband. The three were murdered in Kubsch's home on September 18, 1998. Kubsch was first tried and found guilty in May 2000. The jury recommended and the judge imposed the death penalty. On direct appeal the Indiana Supreme Court held that the first trial violated Kubsch's constitutional rights when the prosecution used his post-*Miranda* silence as evidence against him. Based on that and other errors, the court vacated the convictions and ordered a new trial. See *Kubsch v. State*, 784 N.E.2d 905 (Ind. 2003).

Kubsch's second trial in March 2005 is our focus. Once more a jury convicted Kubsch of the three murders. There were two big differences in the second trial, in addition to avoiding the errors that had required the new trial. First, Kubsch offered as evidence the videotaped interview of Amanda Buck, a nine-year-old neighbor of Aaron and Rick Milewski. Amanda told a police detective four days after the murders that she had seen both Aaron and Rick alive and

well at their home on the day of the murders at a time for which Kubsch has a solid alibi. The judge excluded her recorded statement as hearsay and as having no impeachment value. Second, unlike the first trial, Kubsch decided to waive counsel and represent himself in the sentencing phase of the trial. He also declined to present any mitigating evidence. He told the jury he agreed with the State that no mitigating factors outweighed the aggravating factors supporting a death sentence, but he insisted on his innocence. He ended his brief statement to the jury by saying he did not care what penalty was imposed.

Again the jury's verdict was for death and the judge imposed the death penalty. The state courts affirmed the convictions and sentence on direct appeal, *Kubsch v. State*, 866 N.E.2d 726 (Ind. 2007), and on post-conviction review, *Kubsch v. State*, 934 N.E.2d 1138 (Ind. 2010).

Kubsch then petitioned for a writ of habeas corpus in federal court, raising many more issues than we address in this opinion. The district court denied relief on all claims, *Kubsch v. Superintendent*, No. 3:11CV42–PPS, 2013 WL 6229136 (N.D. Ind. Dec. 2, 2013), and then denied Kubsch's Rule 59 motion, *Kubsch v. Superintendent*, No. 3:11CV42–PPS, 2014 WL 1260021 (N.D. Ind. March 24, 2014). Kubsch appeals. We review the district court's decision *de novo*. E.g., *Harris v. Thompson*, 698 F.3d 609, 622 (7th Cir. 2012).

B. *The Case Against Kubsch*

Chief Judge Simon aptly described the case against Kubsch as a "slow-moving accumulation of a glacier of circumstantial evidence." 2013 WL 6229136, at *3. A critical factor was that Kubsch's account of his own actions changed

dramatically between the night of the murders and his trial testimony, after he knew the constraints imposed by physical and other evidence such as telephone records.

Kubsch lived with his wife Beth in Mishawaka, Indiana. They shared the home with Beth's twelve-year-old son, Anthony Earley. September 18, 1998 was Beth's birthday. She had planned to meet Kubsch for lunch. Beth was supposed to pick up Anthony late in the afternoon after a school dance. When she did not appear, Anthony got a ride home with a friend. At about 5:30, he found Beth's car in the driveway, along with a truck that her ex-husband Rick Milewski was using. The house was locked. Only Wayne, Beth, and Anthony had keys. No one seemed to be home. There was no sign of forced entry.

As Anthony looked around the main floor of the house, though, he saw bloodstains and signs of a struggle. He opened the door to the basement. He saw Rick lying at the foot of the stairs. The handle of a large kitchen knife was sticking out of his chest. Anthony went down the stairs, realized Rick was dead, and also found the body of his eleven-year-old step-brother Aaron lying next to Rick.

Anthony ran for help. Mishawaka police officers arrived about 5:45 p.m. Both Aaron and Rick had multiple stab wounds. The police officers found no sign of gunshot wounds. They also found no sign of Beth. After finding no one else in the house, the police secured the scene until they could obtain a search warrant.

That day Wayne Kubsch had finished work at an area factory shortly before 2:00 p.m. Late in the afternoon, he was returning to Mishawaka from picking up his son in Three

Rivers, Michigan. He dropped off his son at Kubsch's grandmother's home. Kubsch arrived home about 6:45 and found the house surrounded by police. Kubsch was told that Aaron and Rick were dead and that no one knew where Beth was.

Kubsch soon went with police officers to the South Bend police department for questioning by detectives. That initial interview was audio-and video-recorded. Kubsch appeared preoccupied and careful, not distraught or frantic. He made no reference to the search for his missing wife, though there were obviously powerful reasons to be worried about her safety. He showed little emotion.

In that first interview on the night of the murders, Kubsch gave the police his first account of his movements and activities that day. Kubsch said that he and Beth had planned to meet for lunch to celebrate her birthday, but that he had called her to cancel because he had been late for work that morning. He also said that he had gotten permission to leave work early for lunch so he could buy Beth a birthday present (something he did not actually do until much later in the day). He told the police that he had gone home at lunch but could not get inside because he had forgotten his house key. He also did not mention that he had gone home a second time—shortly after work—before going to pick up his son in Michigan.

Kubsch ended the interview. His friend Dave Nichols and Nichols' wife testified that Kubsch called them about 8:00 or 8:30 that evening and said two things known to the killer but not yet known to the police. He told Nichols that Beth was "gone," which Nichols understood to mean that

she was dead, not missing.[2] At that time, Beth's body had not yet been found. And while "gone" might be explained away as ambiguous, Kubsch also told Nichols that Rick and Aaron had been stabbed *and shot*. Not until autopsies were done the next day did the police learn that Rick and Aaron, in addition to their multiple stab wounds, had each been shot in the mouth.

At about 9:00 p.m., police officers on the scene discovered Beth's body. She was just a few feet from Rick and Aaron, but she was hidden underneath the staircase behind blankets that young Anthony had hung up as a sort of "fort" or hiding place a few weeks earlier. She had been stabbed eleven times. Her head was almost entirely covered in gray duct tape. Her body was "hog-tied" with the same tape, her wrists and ankles all bound together behind her back. (An autopsy also showed a blow to the back of her head and defensive wounds on her hands and wrists.) The officers quickly told the detectives at the South Bend station that Beth had been found murdered. The detectives then brought Kubsch back for more questioning later that evening. He declined to talk with them at that point, but he gave them permission to search his car.

The investigation of physical evidence turned up no evidence pointing conclusively to Kubsch. The only blood found on the scene belonged to the victims. The police did not find evidence of the victims' blood on Kubsch or his

---

[2] Nichols' wife, Gina DiDonato, confirmed his account of the telephone call and in response to a juror's question made clear that Kubsch told them that Beth was dead.

clothing. They also found no DNA or fingerprint evidence that pointed to him or anyone else as the killer.

Various items of physical evidence were consistent with Kubsch's guilt. In isolation none is conclusive. Taken together they point toward Kubsch as the killer, though not definitively. In Kubsch's car the police found the wrapper of a roll of duct tape of the type used to bind Beth. A bloody roll of duct tape at the top of the stairs matched the wrapper and the tape on Beth's body. A cloth fiber from the tape roll matched a fiber from the carpet of Kubsch's car. A receipt for purchase of the duct tape, three days before the murders, was found in Kubsch's car.

The police also found in Kubsch's car a wadded-up receipt from a deposit Beth had made the morning of the murders at the drive-through window of her credit union. The presence of that receipt in Kubsch's car contradicted the account he had given police the evening of the murders. (Even Kubsch's explanation at trial, that he found it next to the home telephone on his first stop at home that day, was improbable if not physically impossible. That explanation would have required Beth to do some improbable backtracking between two related errands.)

Of course, the locked house was also evidence that pointed toward Kubsch. The knife in Rick's chest was from the set of kitchen knives upstairs. A kitchen pan also had Beth's blood on it. As the prosecutor pointed out in closing argument, if the killer had been a stranger, it seems improbable that he would have counted on tools found in the home—the knife, the pan, and the duct tape—to carry out the murders.

Telephone records played an important role in the investigation and at trial. Recall that Kubsch had told police that he returned home at lunch but could not get in without his key. Home telephone records showed that was false. A call had been placed from the home telephone while Beth was running her errands that morning. Kubsch testified at trial that he had in fact gotten into the house—through the garage—where he said he made the call, smoked part of a marijuana cigarette, and then left to return to work around noon.[3]

Kubsch also made numerous calls with his cell phone on the day of the murders. Records of those calls showed his approximate locations at different times during the day. He left work for the day just before 2:00. Though he told the police the night of the murders that he had then gone directly to Michigan to pick up his son, he later admitted he had first actually returned to his home. He claimed that he had stopped at home for a few minutes between 2:30 and 2:45 and that no one else was home. At 2:51 Kubsch placed a cell phone call from a cell sector near his home. Cell phone records and other evidence showed that Kubsch then drove to Michigan to pick up his son. The State's theory has been that Kubsch had an opportunity to commit the murders in the time between approximately 2:00 and 3:00.

Another important discrepancy in Kubsch's story was that at 12:09 p.m. he called Rick Milewski and, according to Rick's brother, asked Rick to meet him at his house at 3:00

---

[3] By the time Kubsch testified at trial, of course, he knew about the telephone records and other evidence that contradicted in several key respects the story he had first told the police in his interview the night of the murders.

p.m. to help move a refrigerator. That request is hard to understand if Kubsch was planning to be on his way to Michigan by then. (The prosecution's theory was that Kubsch planned to have Rick find Beth's body but that Rick and Aaron showed up too early, before Kubsch had left, so he killed them too.)

Yet another discrepancy in Kubsch's story came from Beth's mother, Diane Rasor. She testified that when she talked with Kubsch on the afternoon of the murders, she mentioned that she had not been able to get in touch with Beth all day (Beth's birthday, recall). Kubsch reassured her, telling her that he had talked with Beth by phone and knew Beth was running a number of errands and was not at home to answer the phone. Several days after the murders, Kubsch told Rasor that he had not talked to Beth the day she was killed and he wished he had.

Kubsch also had a significant financial motive to murder Beth. The prosecution showed that the couple was in deep financial distress in 1998. Their cash flow was consistently negative. Early that year Kubsch had refinanced eight of the rental properties he owned, converting all available equity into cash and substantially increasing the total debt to about $424,000. Several credit cards or lines of credit were near their maximum limits. About three months before the murders, Kubsch had bought a new insurance policy on Beth's life for $575,000, with himself as the sole beneficiary. Kubsch claimed at trial that he had not realized they were in such difficult financial straits, but he also testified that he took care of the couple's bills, as well as their credit cards and lines of credit, and of course he had undertaken all the refinancing earlier that year.

As Chief Judge Simon summarized:

> The case against Kubsch was entirely circumstantial. There was no eyewitness, no DNA evidence, no fingerprint testimony, indeed no forensic evidence at all that linked Kubsch to the murders. There was, however, moderately strong evidence of motive and opportunity. But most damning to Kubsch was a series of lies, inexplicable omissions, and inconsistencies in what Kubsch told the police and later testified on the witness stand, and these statements—in conjunction with a few pieces of circumstantial evidence—are what almost assuredly got Kubsch convicted.

2013 WL 6229136, at *1.

## II. *Exclusion of Exculpatory Hearsay Evidence*

Kubsch argues that he was convicted of the murders through a violation of his federal due process right to present a defense. The trial court did not allow him to introduce as substantive evidence a witness's videotaped interview with a police detective four days after the murders. Nine-year-old Amanda Buck and her mother Monica were interviewed together by the detective. The Bucks lived across the street from two of the victims, Rick and Aaron Milewski. In the recorded twenty-minute interview, Amanda told the detective that she had seen Rick and Aaron alive and well at their home when she got home from school and daycare, between 3:30 and 3:45 p.m. on the day of the murders, Friday, September 18, 1998.

The date and time are critical. Based on telephone records and other evidence, the State argued at trial that Kubsch murdered the three victims between approximately 2:00 and 3:00 p.m. Kubsch's own testimony placed him at his home between approximately 2:30 and 2:45, though he claimed no one else was there. Cell phone records show that by 3:30 p.m. that day, Kubsch was well on his way to the town of Three Rivers, Michigan to pick up his son for the weekend. He did not return to his home in Mishawaka, Indiana until about 6:45, after the bodies of Rick and Aaron had been discovered there.

The importance of the constitutional evidentiary issue cannot be overstated. If the account given by Amanda in her recorded interview is correct, then Kubsch could not have committed the three murders for which he has been sentenced to death. And apart from Kubsch's own claims of innocence—impeached as they are by his shifting accounts of his movements that day—Amanda's recorded interview is the *only* support for Kubsch's alibi defense.

Kubsch bases his due process claim on *Chambers v. Mississippi*, 410 U.S. 284 (1973), and its progeny. In *Chambers* the Supreme Court reversed a murder conviction on direct appeal. The Court held that the defendant was denied a fair trial when the trial court prevented him from impeaching a witness he had called and excluded hearsay evidence that the same witness had confessed to three different acquaintances that he was the killer. Kubsch relies on the hearsay portion of the *Chambers* analysis and its often-quoted statement that "the hearsay rule may not be applied mechanistically to defeat the ends of justice." 410 U.S. at 302. The actual holding of *Chambers* is considerably narrower, however, for

it depended on the combination of the trial court's limits on cross-examination and its exclusion of the multiple hearsay confessions, and the particular facts and circumstances of the case, which we describe in more detail below. See *id.* at 302– 03.

We address this issue in four steps. Part A explains the details of Amanda's statement and its treatment by the trial court and the Indiana Supreme Court. Part B explains the *Chambers* line of cases and the general constitutional standard for the right to present a defense, as well as its application in cases involving hearsay. Part C considers the factors indicating that Amanda's recorded statement is or is not reliable for purposes of *Chambers*. Part D addresses the issue of our standard of review, which turns out to be rather involved, and explains our conclusion that Kubsch is not entitled to relief.

A. *The Statement in the State Courts*

Four days after the murders, Sergeant Mark Reihl interviewed nine-year-old Amanda Buck and her mother Monica Buck together. The interview was in a police station and was audio-and video-recorded. The Bucks lived across the street from Rick and Aaron Milewski, and Sergeant Reihl asked them what they remembered from the day of the murders. Amanda answered most of the questions, but Monica added her own recollections, including specific times. Amanda recalled seeing both Aaron and Rick at their home across the street after she got home from school and daycare, which would have been between 3:30 and 3:45 on the afternoon of the murders.

Amanda's account was specific about many details, including what she was doing and which truck Rick was driving. She specifically recalled seeing Rick go into his kitchen and return with a glass. Her account was specific about the time and date. She recalled that she and Aaron were planning to go on a school field-trip the next day, a Saturday, and that Aaron had not shown up for the trip. Her mother Monica recalled having seen Aaron (but not Rick) when she got home shortly after 4:00 p.m. after going to the bank to deposit her paycheck, which she usually did on Friday.

The interview was disclosed to the defense, but Kubsch did not call Amanda or Monica as witnesses at his first trial, which took place less than two years after they spoke to the police. At the second trial in 2005, though, Kubsch called then sixteen-year-old Amanda as a witness. She testified that she did not remember whether she saw Rick and Aaron on the afternoon of the murders. She also testified that she did not even remember being interviewed by the police seven years earlier. After her brief testimony, and outside the presence of the jury, Amanda reviewed the recording of her interview. That apparently did not refresh her recollection because Kubsch offered no further testimony from her. Kubsch never called Monica to testify.

The real purpose of calling the sixteen-year-old Amanda was to put into evidence the video recording of the nine-year-old Amanda. Kubsch first tried to introduce the recording as substantive evidence. The recording was hearsay, of course. It was an out-of-court statement offered to prove the truth of its content. At trial, Kubsch argued that it should be admitted as a recorded recollection. Indiana Rule of Evidence 803(5), like its federal counterpart, recognizes an ex-

ception to the rule against hearsay for a "recorded recollection." Recorded recollections are records of what a witness once knew when her memory was fresh but now no longer recalls. A recorded recollection also "accurately reflects the witness's knowledge." Ind. R. Evid. 803(5)(C); see also Fed. R. Evid. 803(5)(C). Examples might include a diary or journal entry or a memorandum to file, as well as recorded interviews.

This recorded statement does not meet the last requirement of Rule 803(5). Amanda would have needed to "vouch for the accuracy" of the statement for it to qualify as a recorded recollection. *Kubsch v. State* (*Kubsch II*), 866 N.E.2d 726, 734 (Ind. 2007), quoting *Gee v. State*, 389 N.E.2d 303, 309 (Ind. 1979). As the trial court found and the Indiana Supreme Court affirmed, "Buck could not vouch for the accuracy of a recording that she could not even remember making." *Kubsch II*, 866 N.E.2d at 735. The videotaped statement did not qualify as a recorded recollection under Indiana evidence law. *Id.*[4]

---

[4] The recording would also not be admissible under Federal Rule of Evidence 803(5), which is substantially identical to its Indiana counterpart and has the same requirement that the declarant endorse the accuracy of the prior recording. See, e.g., *United States v. Green*, 258 F.3d 683, 689 (7th Cir. 2001); *United States v. Schoenborn*, 4 F.3d 1424, 1427–28 (7th Cir. 1993). In fact, neither Kubsch nor our dissenting colleague has identified any federal or state decision indicating that the recording of Amanda's interview would have been admissible under the law of any American jurisdiction. See also, e.g., *State v. Perry*, 768 N.E.2d 1259, 1264–65 (Ohio App. 2002) (under identical recorded recollection rule, affirming exclusion of video recording of interview with eight-year-old child who, when testifying at trial two years later, did not remember the interview and did not testify that the recording correctly reflected her knowledge of events at the time it was made).

Kubsch next offered the videotaped statement to impeach Amanda's trial testimony with extrinsic evidence of a prior inconsistent statement. See Ind. R. Evid. 613(b). As noted, Amanda testified that she simply did not remember talking to the police and did not remember whether she saw her friend and neighbor Aaron between 3:30 and 3:45 p.m. the day of the murders.

The trial court sustained the State's objection to admitting the statement as impeachment evidence because Amanda "testified to no positive fact that is subject to impeachment." Tr. 3120. The Indiana Supreme Court agreed with respect to Amanda's trial testimony that she did not remember what happened or whom she saw on the day of the murders. *Kubsch II*, 866 N.E.2d at 735. However, Amanda also testified at one point that she "probably didn't see" Aaron at home between 3:30 and 3:45 p.m. on the day of the murders. Tr. 2985. The Indiana Supreme Court held that this testimony was properly subject to impeachment and that the trial court had erred by not allowing the attempted impeachment. *Kubsch II*, 866 N.E.2d at 735.

The Indiana Supreme Court also held, however, that the error was harmless. *Id.* In the debate in the trial court about the recording, the State said that if Kubsch were allowed to use Amanda's recorded statement to impeach her trial testimony, the State would respond with additional evidence impeaching the impeachment. The prosecutor asserted that three days after the recorded interview, Lonnie Buck (Monica's father and Amanda's grandfather) had called Sergeant Reihl and reported that both Amanda and Monica had been mistaken about the day they recalled and that they had described for him not the day of the murders but the day be-

fore. Monica had followed up with a later statement saying that she and Amanda had not seen Aaron on the day of the murders. At the time of the 2005 trial, the State was prepared to call both Monica Buck and Sergeant Reihl to impeach the proposed impeachment of Amanda.

The Indiana Supreme Court explained its finding of harmless error:

> Amanda's testimony should have been impeached, but other testimony would have supported hers had she been impeached, and therefore, her testimony likely did not contribute to the conviction. *See Pavey v. State*, 764 N.E.2d 692, 703 (Ind. Ct. App. 2002) ("An error in the admission of evidence is not prejudicial if the evidence is merely cumulative of other evidence in the record.").

866 N.E.2d at 735. Just before this passage, the court dropped a footnote rejecting Kubsch's federal constitutional claim under *Chambers*:

> The availability of this testimony is also the reason why Kubsch's claim that he was denied his federal constitutional right to present a defense fails. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (protecting defendant's due process right by recognizing an exception to application of evidence rules where evidence found to be trustworthy).

*Id*. at 735 n.7.

Unless we keep in mind the difference between substantive evidence and impeachment evidence, which may be

considered not for the truth of the matter asserted but only to evaluate the credibility of other evidence, these terse passages finding harmless error may seem mistaken. After all, if Amanda's statement were admissible as substantive evidence to prove that what she said in the interview was true, then the mere fact that there was some contradictory evidence would not justify its exclusion. (The State's proffered impeachment did not include any admission by Amanda herself that she had been mistaken.) Conflicting evidence would simply present an ordinary question for a jury to resolve, as the trial judge recognized, see Tr. 3015, though a question of great importance because the statement would, if believed, exonerate Kubsch.

When we focus, however, as the trial judge did on the limited role of impeachment evidence, the harmless error finding is clearly sound as a matter of state evidence law. The only thing Amanda said in her trial testimony that was subject to impeachment was that she "probably didn't see" Aaron on the afternoon of the murders. As the trial judge pointed out, "She gave no substantive evidence in this case whatsoever." Tr. 3032. Amanda's narrow substantive statement that she "probably didn't see" Aaron on the afternoon of the murders was not inculpatory. It had essentially no probative value for the jury, so there would have been no point in impeaching her, and the exclusion of her statement for impeachment purposes could not have contributed to Kubsch's convictions.

The Indiana Supreme Court's rejection of the distinct *Chambers* claim in footnote 7 is the focus of our scrutiny. In the trial court, Kubsch had not asserted a distinct federal, constitutional claim under *Chambers*. He made that federal

argument in his direct appeal, though, and the Indiana Supreme Court elected to decide the issue on its merits rather than find a procedural default. Footnote 7 was quite sensible to the extent that the recording was being offered only to impeach the non-inculpatory "probably didn't see him" portion of Amanda's trial testimony. The problem is that that reasoning seems not to have actually engaged with Kubsch's argument under the federal Constitution that the recording should have been admitted *as substantive evidence*. Again, the mere fact that the State would have offered contradictory evidence would have presented a jury question, not a basis for excluding the evidence in the first place. We explore these issues further in Part D on the standard of our review of the state court's decision.

B. *The Right to Present a Defense*

The exclusion of Amanda's recorded statement was not contrary to Indiana evidence law, as the Indiana Supreme Court decided. That conclusion does not resolve the federal constitutional question, though it informs our answer to that question. In a series of decisions led by *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Supreme Court has held that the accused in a criminal case has a federal constitutional right to offer a defense. Both the accused and the state "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id*. at 302. In some circumstances, however, the constitutional right to defend takes precedence over rules of evidence. This can include the hearsay rules, as *Chambers* itself showed.

*Chambers* is the closest Supreme Court case on its facts, so to understand the scope of this right to defend with hearsay,

we consider that case in some detail. Leon Chambers was accused of murdering a police officer in a chaotic disturbance, essentially a small riot, as police were trying to arrest another person. Another man named McDonald had confessed to the murder: "McDonald had admitted responsibility for the murder on four separate occasions, once when he gave the sworn statement to Chambers' counsel and three other times prior to that occasion in private conversations with friends." *Id.* at 289. McDonald was arrested after confessing to Chambers' counsel, but he was released when he repudiated that confession at his own preliminary hearing. *Id.* at 287–88.

Chambers called McDonald as a witness at trial. McDonald's written confession was admitted into evidence, but McDonald again repudiated it. 410 U.S. at 291. Chambers was not allowed to test McDonald's memory or otherwise to challenge his testimony. The state courts relied on the old "voucher" rule under which a party who called a witness was deemed to have vouched for his credibility and so was not allowed to impeach him even if he was actually adverse. The Supreme Court found, however, that the voucher rule was no longer realistic and had been applied to limit unfairly Chambers' examination of a critical witness who was in fact adverse. *Id.* at 295–98.

After his attempts to impeach McDonald were stymied, Chambers then offered the testimony of three friends to whom McDonald had confessed. Their testimony about

McDonald's confessions was excluded as hearsay. *Id.* at 292–93. The jury convicted Chambers of the murder.[5]

On direct appeal, the Supreme Court reversed based on the combination of the voucher rule's barring impeachment of McDonald and the exclusion of the hearsay confessions. *Id*. at 302–03. The Court noted that declarations against interest have long been treated as sufficiently reliable to be excepted from rules against hearsay. *Id.* at 298–99. The Court found that the excluded confessions "bore persuasive assurances of trustworthiness" that brought them "well within the basic rationale of the exception for declarations against interest" and were "critical to Chambers' defense." *Id.* at 302. The Court concluded: "In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id*. The combination of the limits on impeachment and the exclusion of the confessions led the Court to hold that "under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." *Id*. at 303.

*Chambers* does not stand alone. It is the key precedent in a line of cases considering constitutional challenges to rules of evidence that restrict the defense of an accused. See *Washington v. Texas*, 388 U.S. 14, 22 (1967) (rejecting state evidence

---

[5] The Supreme Court's account of the facts was deliberately terse. It made no mention at all, for example, of the case's racial dimensions and the civil rights boycott at the heart of the events in a small town in rural Mississippi in 1969. For a more complete account that emphasizes the gap between local realities and formal legal recognition of civil rights, see Emily Prifogle, *Law and Local Activism: Uncovering the Civil Rights History of Chambers v. Mississippi*, 101 Cal. L. Rev. 445 (2013).

rule that allowed accused accomplices to testify for prosecution but not for defense); *Green v. Georgia*, 442 U.S. 95, 97 (1979) (per curiam) (vacating death sentence where defendant was barred from using same out-of-court confession that prosecution used to obtain death penalty against declarant); *Crane v. Kentucky*, 476 U.S. 683, 691 (1986) (rejecting state court's wholesale exclusion of testimony about circumstances of defendant's confession); *Rock v. Arkansas*, 483 U.S. 44, 56 (1987) (rejecting state rule excluding all hypnotically refreshed testimony as applied to bar defendant's own testimony); *Montana v. Egelhoff*, 518 U.S. 37 (1996) (upholding state rule barring consideration of evidence of voluntary intoxication in determining *mens rea*); *United States v. Scheffer*, 523 U.S. 303 (1998) (upholding military rule of evidence barring use of polygraph test showing "no deception" in denial of drug use by defendant); *Holmes v. South Carolina*, 547 U.S. 319, 330 (2006) (rejecting state rule barring defendant from introducing evidence of third-party guilt when prosecution has introduced forensic evidence that, if credited, is strong proof of defendant's guilt).

In the *Chambers* line of cases, the Court has balanced competing interests, weighing the interests in putting on a full and fair defense against the interests in orderly procedures for adjudication and use of reliable evidence that can withstand adversarial scrutiny. In striking this balance, the Court has recognized that "State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes*, 547 U.S. at 324 (brackets and internal quotation marks omitted), quoting *Scheffer*, 523 U.S. at 308. Those rules are then put into practice by trial judges "called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evi-

dence" in a criminal trial. *Crane*, 476 U.S. at 689. The latitude exercised by rulemakers and the trial judges they empower proves that the right to "present a complete defense" is not absolute. *Id.* at 690, quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984). Nevertheless, "to say that the right to introduce relevant evidence is not absolute is not to say that the Due Process Clause places *no* limits upon restriction of that right." *Montana v. Egelhoff*, 518 U.S. 37, 42–43 (1996) (plurality opinion).

The general constitutional standard can now be stated this way: rules of evidence restricting the right to present a defense cannot be "arbitrary or disproportionate to the purposes they are designed to serve." *Rock*, 483 U.S. at 56. The most recent in the *Chambers* line of cases explained that the Court has struck down as "arbitrary" those restrictions that "excluded important defense evidence but that did not serve any legitimate interests." *Holmes*, 547 U.S. at 325. We have applied this constitutional standard to grant habeas relief in strong cases. E.g., *Harris v. Thompson*, 698 F.3d 609 (7th Cir. 2012); *Sussman v. Jenkins*, 636 F.3d 329 (7th Cir. 2011). We have also denied relief where there was room for reasonable jurists to disagree. E.g., *Dunlap v. Hepp*, 436 F.3d 739 (7th Cir. 2006); *Horton v. Litscher*, 427 F.3d 498, 504 (7th Cir. 2005).

### 1. *The Parity Principle*

One way a state rule of evidence may be arbitrary is where it restricts the defense but not the prosecution. Several cases in the *Chambers* line have emphasized this "'parity' principle: a state rule that restricts the presentation of testimony for the defense but not the prosecution will generally be deemed arbitrary." *Harris*, 698 F.3d at 632, citing Akhil Reed Amar, *Sixth Amendment First Principles*, 84 Geo. L.J. 641,

699 (1996). For example, *Washington v. Texas* struck down a state rule allowing alleged accomplices to testify *against* each other but forbidding them from testifying *for* each other. 388 U.S. at 22. *Green v. Georgia* struck down another violation of the parity principle. In that case state courts excluded hearsay evidence that the defendant tried to introduce in his capital sentencing hearing after the state had used that same hearsay evidence against his accomplice in the accomplice's trial. 442 U.S. at 96–97.

The parity approach to evaluating reliability enables "defendants to benefit from the balance that the state tries to strike when its own evidence-seeking self-interest is at stake." See Amar, 84 Geo. L.J. at 699. If the rule excluding evidence is in fact the product of a genuine balancing of interests by the state, that weighs in favor of respecting the balance by regarding the evidence as unreliable no matter which side it favors. See *id.*

Nothing in the record indicates that the State would have been able to introduce Amanda's recorded statement if it had been inculpatory rather than exculpatory. Whether inculpatory or exculpatory, Amanda "could not vouch for the accuracy of a recording that she could not even remember making," and her statement would not qualify as a recorded recollection regardless. *Kubsch II*, 866 N.E.2d at 735.

The State thus seems to have struck a genuine balance that excludes hearsay evidence like this no matter whom it benefits. But that is not the end of the matter. The *Chambers* line of cases can also protect the accused from a restrictive evidentiary rule that is disproportionate to its purposes. That leads us to the question of reliability.

2. *Reliability*

Reliability is the core of the hearsay rule and its many exceptions. See Federal Rules of Evidence, Article VIII, Advisory Committee Notes (1972). Our adversarial system relies first and foremost on in-court testimony. In court, a trier of fact may watch and listen to a declarant whose testimony is offered to prove the truth of its contents, and adverse parties may further test such testimony through vigorous cross-examination. "The principal justification for the hearsay rule is that most hearsay statements, being made out of court, are not subject to cross-examination." *Rice v. McCann*, 339 F.3d 546, 551 (7th Cir. 2003) (Posner, J., dissenting); accord, Federal Rules of Evidence, Article VIII, Advisory Committee Notes; 30 Wright & Graham, Federal Practice and Procedure § 6325 (1997).

When deciding whether to fashion a hearsay exception, the central question is whether the circumstances and content of an out-of-court statement give the court confidence that the statement is sufficiently reliable to admit as evidence despite the inability to test it directly in court. See, e.g., *Chambers*, 410 U.S. at 298–99 ("A number of exceptions have developed over the years to allow admission of hearsay statements made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination."); Fed. R. Evid. 807(a)(1) (residual hearsay exception requires "equivalent circumstantial guarantees of trustworthiness").

The hearsay portion of *Chambers* thus turned on whether McDonald's hearsay confessions bore sufficient indications of reliability that a mechanical application of the state hearsay rule violated Chambers' right to defend himself at trial.

The *Chambers* Court identified four factors that together provided "considerable assurance" of the reliability of the excluded confessions. First, each confession was made spontaneously to a close acquaintance of the declarant shortly after the murder. Second, each statement was corroborated by other evidence. Third, the statements were against the declarant's own interest. Fourth, the declarant was available at trial for cross-examination. *Id.* at 300–01.

*Green v. Georgia* also addressed the exclusion of hearsay testimony. Two men, Green and Moore, participated in a rape and murder. Moore had been convicted and sentenced to death. At his trial and sentencing, the state had used against him his out-of-court confession to a friend that he had fired the fatal shots. Yet when Green was being sentenced and offered the same evidence to show that he was less culpable than Moore, it was excluded as hearsay. 442 U.S. at 96–97. The Supreme Court reversed, emphasizing the state's use of the evidence against Moore as perhaps the "most important" reason for trusting the reliability of the testimony. *Id.* at 97. But the Court also made note of other "substantial reasons" to treat the confession as reliable. The confession was made spontaneously to a close friend, it was against Moore's penal interest, there was no reason to believe Moore had any ulterior motive to make it, and there was ample corroborating evidence. "In these unique circumstances," the Court wrote, "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.*, quoting *Chambers*, 410 U.S. at 302.

C. *Amanda's Statement—Reliable or Not?*

*Chambers* and *Green* both reversed the exclusion of another person's hearsay confession against penal interest when

there were substantial indications that the confession was reliable. The problem posed by Amanda Buck's recorded interview, and specifically by whether she saw Aaron and Rick Milewski on the afternoon of the murders or on another day, is quite different.

Weighing in favor of reliability, the interview was recorded, so there is no doubt about what was said, and the interview took place just a few days after the events in question, when memories were fresh. In addition, Amanda was quite detailed and specific in her account. She had nothing to gain by lying and there is no indication that she did so.

Other factors weigh against her statement's reliability, however. The extent of corroboration was central to the reasoning in *Chambers*. McDonald's four independent confessions corroborated each other. They were also corroborated by the testimony of other witnesses: one who saw McDonald shoot the officer, another who saw him with a gun immediately afterward, and another who knew he had owned a gun like the murder weapon and later replaced it with another similar gun. *Chambers*, 410 U.S. at 293 n.5, 300. Furthermore, in *Green* the Court described the corroborating evidence there as "ample," and of course the state had treated the other man's confession to firing the fatal shots as sufficiently reliable to use it to sentence him to death. 442 U.S. at 97.

In this case, by contrast, there simply is no corroboration of Amanda's statement on the critical point, which is whether Aaron and Rick were at their home alive and well between 3:30 and 3:45 on the day they were murdered.[6] (No corrobo-

---

[6] Kubsch points out that Rick Milewski was driving not his own black truck but a white truck that he had borrowed from his brother. In

ration, that is, other than Monica's initial statement that she also saw Aaron at home that afternoon, a statement that Monica later corrected, that was never offered as evidence, and that could not have been admitted as substantive evidence to corroborate Amanda's statement.) The minimal corroboration for Amanda's recorded statement distinguishes this case from *Chambers* and *Green* and their reasoning. See *Rice*, 339 F.3d at 550 (affirming denial of habeas relief in part because state court found hearsay statements in question were not corroborated).

The availability of cross-examination was also central to *Chambers*: "Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury." 410 U.S. at 301.

In this respect, as well, the evidence here is quite different from the confessions in *Chambers*. Unlike the declarant in *Chambers*, Amanda was essentially unavailable for cross-examination. She took the stand at trial but testified that she did not remember being interviewed by the police or what she said to them. "A declarant is considered to be unavailable as a witness if the declarant … testifies to not remembering the subject matter." Ind. R. Evid. 804(a)(3); Fed. R. Evid. 804(a)(3).

---

her statement, Amanda said that Rick was driving a white truck that day. But as Kubsch also acknowledges, Rick had borrowed that truck from his brother a few weeks before the murders. The color of the truck does not corroborate Amanda's statement about which afternoon she saw Rick and Aaron at home.

In addition, during the recorded interview, Amanda was never pushed on the critical details—the date and time she saw Aaron and Rick at their home. The interviewing officer was simply taking her account as she spoke in an interview in the early stages of the investigation. Amanda was not under oath, and Sergeant Reihl did not test her story to see how certain and accurate she might have been. Sergeant Reihl's gentle questioning, which was surely appropriate for his purpose at the time, was not remotely like cross-examination of the alibi witness in a murder trial where the stakes are life and death. There was no cross-examination here; there was not even a mild challenge.

By comparison, when a witness is unavailable, it is clear that even former *testimony* is admissible under the rules of evidence only if it is offered against a party who had both an opportunity and a similar motive to develop that witness's testimony by direct, cross-, or redirect examination. Ind. R. Evid. 804(b)(1); Fed. R. Evid. 804(b)(1).

Moreover, if the recorded statement had been admitted, the State would have been unable to test its accuracy through cross-examination. The prosecutor would have been stuck questioning a witness who did not even remember making the statement. See Fed. R. Evid. 804(a)(3) advisory committee note ("the practical effect" of lack of memory "is to put the testimony beyond reach"); 2 McCormick on Evidence § 253 (7th ed.) (a declarant who does not remember the subject matter of her testimony "is simply unavailable by any realistic standard").

In the adversarial system of Anglo-American law, we put great trust in the power of cross-examination to test both the honesty and the accuracy of testimony. It is virtually an arti-

cle of faith that cross-examination is the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970), quoting 5 Wigmore on Evidence § 1367. Without cross-examination to test "any question about the truthfulness" of Amanda's recorded statement, a powerful assurance of reliability present in *Chambers* is absent here. *Chambers*, 410 U.S. at 301; see also *Christian v. Frank*, 595 F.3d 1076, 1085 (9th Cir. 2010) (reversing grant of habeas relief under *Chambers*; witness's "unavailability contrasts sharply with the availability of McDonald in *Chambers*, which the Supreme Court of the United States stressed greatly enhanced the reliability of the extrajudicial statements in that case").[7]

---

[7] Our dissenting colleague contends that this case is like *Chambers* because Kubsch, like Chambers, tried to show that someone else committed the murders—Kubsch's long-time friend Brad Hardy. Post at 95–96. We disagree. In *Chambers*, the evidence against McDonald would have exonerated Chambers; there was no evidence that they acted together. Readers of the dissent might think there was a similar either-or dynamic at work here. There was not. The prosecution argued that Hardy had either helped Kubsch or had been set up by Kubsch as his fall guy.

Hardy testified in both of Kubsch's trials, though at the time of the first trial he was charged with conspiring with Kubsch to commit the murders. (The charges were later dismissed.) Kubsch called Hardy on the day of the murders at 9:11 a.m. Hardy and his mother, Constance Hardy, each testified that Constance drove Hardy to Kubsch's workplace two hours later when Kubsch began his early lunch break. Hardy testified that Kubsch then drove him to a parking lot near the Kubsch house and asked him to sneak up to the house from the rear to see if Beth was home. Hardy also testified that the day after the murders Kubsch asked him to lie about their activities the day before. (Kubsch denied Hardy's account.)

D. *The Standards of Review and Their Application*

To win a federal writ of habeas corpus, Kubsch must show that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). Since the Antiterrorism and Effective Death Penalty Act (AEDPA) amended § 2254 in 1996, though, if a state court has adjudicated a federal claim on the merits, it is not enough for the petitioner to show a violation of federal law. The petitioner must also show that the state court adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). On Kubsch's claim

---

Phone records showed that Kubsch again called Brad Hardy on the day of the murders at 4:44 p.m. It is undisputed that Kubsch arrived at Brad and Constance Hardy's house 45 minutes later and stayed for an hour before going to his home. The defense argued that this visit was for the purpose of "invit[ing] [Brad] out to dinner that night." Tr. at 3301. It is curious that, on the evening of his wife's birthday—when Kubsch claims not to have seen Beth all day and after Beth's mother called him to say that she was concerned about not hearing from Beth—Kubsch would take an hour-long detour to Hardy's house just to extend a dinner invitation, especially when he had spoken to Hardy just 45 minutes earlier. In light of this curious detour, the fact that Beth's credit cards were later found in the woods near Hardy's house could be viewed as implicating Kubsch as much as Hardy. In short, the "significant evidence pointing to Hardy" did not necessarily tend to exonerate Kubsch, as the dissent suggests and in contrast to the evidence related to Gable McDonald in *Chambers*.

under *Chambers*, our focus is on the state court's legal analysis under subsection (d)(1), not factual findings under (d)(2).

We agree with the district court that the Indiana Supreme Court adjudicated on the merits Kubsch's federal constitutional claim under *Chambers*. Footnote 7 of the state court's opinion made that much clear, see *Kubsch II*, 866 N.E.2d at 735 n.7, so we must evaluate the decision under § 2254(d)(1). Section 2254(d)(1) has two distinct prongs, the narrow "contrary to" prong and the broader "unreasonable application" prong.

### 1. *"Contrary to" Federal Law?*

On the first prong, the Indiana Supreme Court's adjudication of the *Chambers* claim was not "contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States." Because no Supreme Court cases "confront 'the specific question presented by this case,' the state court's decision could not be 'contrary to' any holding from" that Court. *Woods v. Donald*, 575 U.S. —, 135 S. Ct. 1372, 1377 (2015) (per curiam) (summarily reversing grant of habeas petition), quoting *Lopez v. Smith*, 574 U.S. —, 135 S. Ct. 1, 4 (2014) (per curiam). Under § 2254(d), clearly established federal law includes only "the holdings, as opposed to the dicta," of Supreme Court decisions. *White v. Woodall*, 572 U.S. —, 134 S. Ct. 1697, 1702 (2014), quoting *Howes v. Fields*, 565 U.S. —, 132 S. Ct. 1181, 1187 (2012).

To note again just the most obvious differences between this case and *Chambers*, Amanda did not make her statement spontaneously to a close acquaintance, her statement was not against interest, her statement was not corroborated, and she was not subject to cross-examination about the state-

ment. Any of those distinctions would be enough to demonstrate that the Indiana Supreme Court did not confront "facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrive at the opposite result. See *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

### 2. *"Unreasonable Application" of Federal Law?*

The second and broader prong, whether the Indiana Supreme Court's rejection of Kubsch's claim under *Chambers* was, also in the terms of § 2254(d)(1), an "unreasonable application" of clearly established federal law as determined by the Supreme Court of the United States, poses a more difficult question. The state court's rejection of the *Chambers* claim was at best incomplete and at worst wrong and unreasonably so. That poses a methodological question on which federal law is not settled. We explore that methodological question below but ultimately conclude that Kubsch's claim under *Chambers* fails whether or not we apply deferential review under AEDPA.

The narrow holding of *Chambers*, based on the combination of the restrictions on impeachment and the exclusion of multiple reliable hearsay confessions by a declarant subject to cross-examination, topped off by the "under the facts and circumstances of this case" qualification, see 410 U.S. at 303, means that state courts have considerable latitude in interpreting and applying *Chambers*. See *Dunlap v. Hepp*, 436 F.3d 739, 744 (7th Cir. 2006), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Nevertheless, the broader standard that has emerged from *Chambers* and subsequent cases is that courts cannot impose restrictions on defense evidence that are arbitrary or disproportionate to the purposes they are designed to serve. See *Holmes*, 547 U.S. at 325; *Rock*, 483 U.S.

at 56. The general standard requires a balance of competing interests.

The open texture of that standard and the important factual differences between this case and *Chambers*—lack of corroboration and lack of opportunity for meaningful cross-examination—mean that the Indiana courts *could have* rejected Kubsch's claim under *Chambers* without unreasonably applying clearly established federal law as determined by the Supreme Court of the United States. See 28 U.S.C. § 2254(d)(1); see generally, e.g., *Woods v. Donald*, 135 S. Ct. at 1377 ("where the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims"), quoting *White v. Woodall*, 572 U.S. —, 134 S. Ct. at 1705, quoting in turn *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003). Only rarely has the Supreme Court "held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 133 S. Ct. 1990, 1991–92 (2013) (per curiam) (summarily reversing grant of habeas relief on *Chambers* claim: "no prior decision of this Court clearly establishes that the exclusion of this evidence violated respondent's federal constitutional rights").

Thus, when habeas relief has been granted on a *Chambers* claim, the facts were a much closer fit to the Supreme Court precedents. In *Cudjo v. Ayers*, 698 F.3d 752 (9th Cir. 2012), for example, the state court had found that the hearsay testimony was "trustworthy and material exculpatory evidence" that should have been admitted under state law but still declined to grant relief under *Chambers*. See *id.* at 763. *Cudjo* thus held that its facts were "materially indistinguishable" from *Chambers*. *Id.* at 767, quoting *Williams,* 529 U.S. at 405. In

discussing the rule that defendants have a constitutional right to present a complete defense, *Cudjo* also commented that "it would be extremely difficult to say that a state trial court engaged in an 'unreasonable application' of this rule when faced with new factual circumstances." *Id.*; cf. *Cudjo*, 698 F.3d at 770–74 (O'Scannlain, J., dissenting).

Accordingly, if the Indiana Supreme Court had announced its rejection of Kubsch's claim under *Chambers* without any explanation at all, then we would affirm the denial of habeas relief without further ado. See *Harrington v. Richter*, 562 U.S. 86, 98 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

But the Indiana Supreme Court was not silent on the point. It rejected Kubsch's claim under *Chambers* in a footnote consisting of one sentence and one citation:

> The availability of this testimony [from Monica Buck and Sergeant Reihl to the effect that Amanda had been mistaken] is also the reason why Kubsch's claim that he was denied his federal constitutional right to present a defense fails. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (protecting defendant's due process right by recognizing an exception to application of evidence rules where evidence found to be trustworthy).

866 N.E.2d at 735 n.7.

This terse footnote shows that the state court was aware of the federal constitutional claim and the governing Su-

preme Court precedent. It cited the page of the *Chambers* opinion finding that the multiple hearsay confessions by McDonald "bore persuasive assurances of trustworthiness" and should have been admitted because they were so critical to the defense. Keeping in mind the presumption that state courts know and follow the law, see *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam), we find it sufficiently clear that the state court found that Amanda's statement was not sufficiently reliable to require its admission under *Chambers*. The state court adjudicated the merits, so its decision requires deference under AEDPA.

The problem is that the only reason actually given by the Indiana Supreme Court—the availability of contradictory testimony from Amanda's mother and Sergeant Reihl—is the weakest reason that might support that result. It was a good reason to treat as harmless the exclusion of the recorded statement as impeachment, but not as substantive evidence. The mere existence of conflicting or impeaching evidence is not a sufficient basis, or even a reasonable basis, for rejecting the statement as substantive evidence. Conflicting evidence would simply present a fact issue for the jury to weigh after hearing all of that evidence. Perhaps the state court also had in mind the stronger reasons for excluding Amanda's recorded statement, especially the lack of corroboration and the lack of an opportunity for cross-examination, but if so it did not mention them.

What is the role of the federal courts when a state court offers such a weak reason for a result that could be a reasonable application of federal law? See *Brady v. Pfister*, 711 F.3d 818, 824–27 (7th Cir. 2013) (identifying problem and discussing Supreme Court's limited guidance). We must review the

actual reason deferentially. But if that reason was unreasonable, do we proceed to *de novo* review? Or do we, instead of doing *de novo* review, hypothesize reasons the court could have used to see if they are reasonable under AEDPA? See *Stitts v. Wilson*, 713 F.3d 887, 893 (7th Cir. 2013) (raising but not answering this question).[8]

We have interpreted *Richter* as instructing federal courts to consider what arguments "could have supported" a state court decision when the state court "gave some reasons for an outcome without necessarily displaying all of its reasoning." *Hanson v. Beth*, 738 F.3d 158, 163–64 (7th Cir. 2013) (affirming denial of relief on *Chambers* claim based on exclusion of evidence); see also *Jardine v. Dittmann*, 658 F.3d 772, 777 (7th Cir. 2011) ("This court must fill any gaps in the state court's discussion by asking what theories 'could have supported' the state court's conclusion."), quoting *Richter*, 562 U.S. at 102.[9]

The Indiana Supreme Court's stated rationale for rejecting Kubsch's claim can be described fairly as incomplete. So

---

[8] In *Stitts* we considered whether to "look through" a state supreme court's ruling to a lower state court's decision. In this case, we cannot "look through" the Indiana Supreme Court's ruling on the *Chambers* claim. The claim was not presented to the trial court, and capital appeals in Indiana go directly to the Indiana Supreme Court.

[9] *Makiel v. Butler*, 782 F.3d 882, 905–06 (7th Cir. 2015), presented a related but distinct issue. In *Makiel*, the state court gave two reasons why the exclusion of certain evidence did not violate the petitioner's right to present a complete defense. One reason was flawed but the second was sound. The sound second reason was enough to call for AEDPA deference. Here, by contrast, the state court gave only one reason to reject the constitutional claim, and that reason is flawed.

long as we have an obligation under § 2254(d)(1) to fill gaps or to complete the state court's reasoning, the result here is not an unreasonable application of federal constitutional law, and relief must be denied on this claim.[10]

---

[10] Most circuits endorse this approach that allows and even requires federal courts to complete or fill the gaps in state courts' reasoning in support of results that are not unreasonable in light of Supreme Court precedent. See *Foxworth v. St. Amand*, 570 F.3d 414, 429 (1st Cir. 2009) ("on habeas review, the ultimate inquiry is not the degree to which the state court's decision is or is not smoothly reasoned; the ultimate inquiry is whether the outcome is reasonable"); *Rashad v. Walsh*, 300 F.3d 27, 45 (1st Cir. 2002) (where federal courts were troubled by gaps in state court's rationale: "It is not our function, however, to grade a state court opinion as if it were a law school examination."); *Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) ("deficient reasoning will not preclude AEDPA deference"); *Collins v. Sec'y of Pennsylvania Dep't of Corr.*, 742 F.3d 528, 548 (3d Cir. 2014) (while state court adjudication of *Strickland* claim consisted of "admittedly cursory statements, AEDPA requires that we determine what arguments or theories supported … or could have supported, the state court's decision") (citation and internal quotation marks omitted); *Robinson v. Polk*, 438 F.3d 350, 358 (4th Cir. 2006) ("In assessing the reasonableness of the state court's application of federal law, therefore, the federal courts are to review the *result* that the state court reached, not whether its decision was well reasoned.") (brackets, citations, and internal quotation marks omitted); *Higgins v. Cain*, 720 F.3d 255, 261 (5th Cir. 2013) ("In considering whether the state court's decision constituted an unreasonable application of clearly established federal law, 'a federal habeas court is authorized by Section 2254(d) to review only a state court's "decision," and not the written opinion explaining that decision.'"), quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) ("The law requires such deference to be given even in cases, such as this one, where the state court's reasoning is flawed or abbreviated."); *Williams v. Roper*, 695 F.3d 825, 831 (8th Cir. 2012) ("In reviewing whether the state court's decision involved an unreasonable application of clearly established federal law, we examine the ultimate legal conclusion reached by the court,

### 3. *De Novo Review*

There is room to argue, however, that the state court's footnote 7 was not just incomplete but wrong, and unreasonably so. And there is room to argue that where the state court has provided a rationale for its decision, the federal courts should focus their attention on the reasons actually given rather than hypothesize a better set of reasons. See *Wiggins v. Smith*, 539 U.S. 510, 528–29 (2003) (holding state court's rationale unreasonable without considering other possibilities); *Frantz v. Hazey*, 533 F.3d 724, 737–38 & n.15 (9th Cir. 2008) (en banc) (confining analysis to reasons actually given by state court, without hypothesizing alternative rationales); *Oswald v. Bertrand*, 374 F.3d 475, 483 (7th Cir. 2004) ("reasonableness of a decision ordinarily cannot be assessed without considering the quality of the court's reasoning," though "ultimate question ... is not whether the state court gets a bad grade for the quality of its analysis but ... whether the decision is an unreasonable application of federal law"). As we explained in *Brady v. Pfister*, when evaluating a state court's reasoning in habeas cases, the Supreme Court has fo-

---

not merely the statement of reasons explaining the state court's decision.") (citation omitted); *Williams v. Trammell*, 782 F.3d 1184, 1199–1200 (10th Cir. 2015) ("uncertainty" regarding rationale for a sparse state court decision "does not change our deference;" federal court still must identify theories that could have supported the decision); *Lee v. Comm'r, Alabama Dep't of Corr.*, 726 F.3d 1172, 1210–14 (11th Cir. 2013) (applying AEDPA deference to incomplete state court opinion; state court need not "show its work" by mentioning all circumstances relevant to *Batson* claim); but see *Frantz v. Hazey*, 533 F.3d 724, 737–38 & n.15 (9th Cir. 2008) (en banc) (confining evaluation of "unreasonable application" prong to actual reasons given).

cused on the reasons actually given by state courts without engaging in the exercise of trying to construct reasons that could have supported the same result. See 711 F.3d at 826, citing *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Wiggins v. Smith*, 539 U.S. 510 (2003). So AEDPA deference toward state court decisions that reach defensible results for bad or incomplete reasons is not necessarily settled law at this point.

This debate over methodology under § 2254(d) may be ripening for a resolution. In *Hittson v. Chatman*, 576 U.S. —, 135 S. Ct. 2126 (2015), a short opinion concurring in denial of certiorari reminded circuit and district judges of the Court's decision in *Ylst v. Nunnemaker*, 501 U.S. 797 (1991), in which the Court instructed that when federal habeas corpus courts review an unexplained order from a state appellate court, they should "look through" that unexplained order and focus on the last reasoned rejection of the federal claim. See 501 U.S. at 803–04. In the *Hittson* concurring opinion, Justice Ginsburg (joined by Justice Kagan) wrote that the *Nunnemaker* "look through" presumption remains valid after *Richter*. See 135 S. Ct. at 2127, discussing *Richter*, 562 U.S. at 99–100, citing *Nunnemaker* with approval; see also *Brumfield v. Cain*, 576 U.S. —, 135 S. Ct. 2269, 2276 (2015) (applying *Nunnemaker* "look-through" approach to evaluate and reverse lower state court's factual findings supporting denial of evidentiary hearing under § 2254(d)(2)); *Johnson v. Williams*, 568 U.S. —, — n.1, 133 S. Ct. 1088, 1094 n.1 (2013) (citing *Nunnemaker* with approval); *Hawthorne v. Schneiderman*, 695 F.3d 192, 199–201 (2d Cir. 2012) (Calabresi, J., concurring) (arguing that practice under *Richter* of inventing hypothetical reasons for state court decision promotes neither comity nor efficiency).

Justice Ginsburg's opinion in *Hittson* argued that the *Richter* practice of hypothesizing rationales for state court rejections of federal claims should be limited to cases where no state court explained the rejection, and that where the state court's real reasons can be ascertained, the inquiry under § 2254(d)(1) "can and should be based on the actual 'arguments or theories [that] supported … the state court's decision." 135 S. Ct. at 2128–29, quoting *Richter*, 562 U.S. at 102. This statement may imply that federal courts should shift to *de novo* review as soon as they find that the reason actually given by a state court was unreasonable, without trying to hypothesize alternative rationales.

Because of this uncertainty in whether we may "complete" the state court's reasoning on this *Chambers* claim, it is prudent for us also to consider Kubsch's *Chambers* claim under a *de novo* standard of review. Even if we conclude that the state court's footnote 7 was an unreasonable application of *Chambers* to reject Kubsch's claim, that would not necessarily entitle Kubsch to habeas relief. He would still need to show on the merits that his constitutional rights were in fact violated, as § 2254(a) requires for a grant of actual relief. See *Brady*, 711 F.3d at 827 (applying *de novo* review in the alternative); *Mosley v. Atchison*, 689 F.3d 838, 852–54 (7th Cir. 2012) (where state court decision was unreasonable under § 2254(d)(1), remanding to district court to determine merits *de novo* under § 2254(a)).

If *de novo* review applies, the issue is closer than under § 2254(d)(1), but we conclude that the exclusion of Amanda's recorded statement as substantive evidence did not violate Kubsch's federal constitutional right to put on a defense. As explained above, Amanda's statement is not corroborated on

the critical facts by any other evidence, and she was never subjected to meaningful cross-examination. Even during the recorded interview itself, she was never pushed by the interviewer about the critical day and time, nor about the possibility that her memory had confused events of two different days.

Those facts distinguish this case from *Chambers*, which was, on its face, a very narrow opinion. Recall that the holding in *Chambers* depended on the combination of the limits the "voucher rule" placed on cross-examination and the exclusion of the three hearsay confessions, which were directly corroborated in many ways and had other indications of reliability. 410 U.S. at 302–03.

Even applying the more general principles from the *Chambers* line of cases, we are not persuaded that the Constitution requires the general rule against hearsay to give way to Kubsch's interest in offering as substantive evidence a recorded, exculpatory interview of a witness who was in effect not available for cross-examination and whose account does not have significant corroboration on the critical points.

A vast literature attempts to explain the complex edifice of American hearsay law. A helpful and authoritative explanation came from the Advisory Committee on the Federal Rules of Evidence, published as an introductory note to the hearsay article in the Rules. A helpful and more detailed survey is available in 30 Wright & Graham, Federal Practice and Procedure §§ 6321–6333 (1997). As noted above, issues of reliability and trustworthiness are front and center in deciding whether to relax the general prohibition on hearsay. Our legal system relies primarily on in-person testimony subject to meaningful cross-examination, the "greatest en-

gine ever invented for the discovery of truth," to test evidence. See *California v. Green*, 399 U.S. 149, 158 (1970), quoting Wigmore on Evidence § 1367; see also *Rice v. McCann*, 339 F.3d 546, 551 (7th Cir. 2003) (Posner, J., dissenting) ("The principal justification for the hearsay rule is that most hearsay statements, being made out of court, are not subject to cross-examination.").

Lest this reasoning seem like reflexive devotion at the altar of cross-examination, we draw help from Professors Wright and Graham to explain why this is so important. Their treatise identifies four dangers of hearsay: (1) defects in the declarant's perception; (2) defects in the declarant's memory; (3) defects in narration by both the declarant and the witness; and (4) the declarant's lack of sincerity or honesty. 30 Wright & Graham, Federal Practice and Procedure §§ 6324. Without an opportunity for cross-examination before the trier of fact, it can be difficult to test hearsay for these defects. Most hearsay exceptions have evolved from situations providing circumstantial guaranties of trustworthiness that seem to be sufficient substitutes for that direct scrutiny in a trial. See *id.*, § 6333.

In the case of Amanda's recorded statement, the third and fourth dangers seem minimal. The recording eliminates the risk that Amanda's statement would be relayed inaccurately, and she had no apparent difficulty describing what she remembered. The nine-year-old Amanda in the interview was also a disinterested witness, old enough to know she should tell the truth and with no apparent reason to deceive the police intentionally.

The first two dangers remain, however, with no meaningful protections under these circumstances. There simply is

no way to test directly, by cross-examination or otherwise, the accuracy of the nine-year-old Amanda's memories of the past several days, to test the possibility that she was misre-membering what and whom she had seen where and on which days. The accuracy of her memory was not tested or even challenged during the recorded interview itself, nor was the importance of being accurate about the time and date brought to her attention in the interview. Nor is there other evidence corroborating the recorded account as to the critical date and time.

In light of these considerations, it was not arbitrary or disproportionate to enforce the rules of evidence to exclude Amanda's recorded statement as substantive evidence. Accepting Kubsch's theory, on the other hand, would upset a good deal of the rules of evidence developed over generations to find the right balance so that trials can be decided fairly and on the basis of reliable evidence. As the prosecutor said in the trial court here, we could just show juries a series of videotaped, *ex parte* witness interviews, but that is not how we do trials in our legal system. There is no indication in the narrow *Chambers* opinion that such a sweeping result was intended then. Nor do the Supreme Court's later cases in the *Chambers* line endorse such a sweeping result.

Kubsch argues that he seeks only a narrow exception, comparable to the narrow decision in *Chambers*. He tries to limit the rule he seeks to hearsay witness statements that are recorded (ensuring accuracy of transmission), about recent events (fresh in the witness's memory), detailed, and from disinterested witnesses, at least where the evidence would be critical to the defense. With inexpensive recording technology widely available, however, we can expect that such

evidence will often be available. Kubsch's theory would thus expand dramatically the availability, at least to the accused, of hearsay evidence that cannot be subjected to meaningful cross-examination. Considering the *Chambers* issue *de novo*, we believe Kubsch is seeking a significant and unwarranted expansion of existing doctrine, unmoored from the critical assurances that corroboration and cross-examination provided in *Chambers* itself.

We do not doubt that hearsay rules sometimes exclude evidence that is in fact accurate. They also exclude a good deal of evidence that is unreliable. Those rules have evolved based on experience to prevent the use of inaccurate and unreliable hearsay in trials. We also must recognize the risk of error in our human and fallible criminal justice system, especially in a death-penalty case. That is why *Chambers* was decided as it was, though the sentence there had been life in prison rather than death. In that exceptional case, the familiar rules of evidence worked arbitrarily to exclude reliable evidence of innocence.

The risk of serious error is not enough, however, to open the gates to all hearsay of this type, especially where it is not corroborated as it was in *Chambers* and where it is not subject to meaningful cross-examination. The unavoidable risk of error may offer a strong argument against the death penalty as a matter of policy, but that is not a choice available to us. See, e.g., *Glossip v. Gross*, 576 U.S. —, 135 S. Ct. — (2015) (all opinions).

Accordingly, we affirm the district court's denial of relief on the *Chambers* claim. The state court's result on this question was not an unreasonable application of federal law. And even if the state court's incomplete and unsatisfactory ra-

tionale had amounted to an unreasonable application of federal law, Kubsch's claim does not prevail on the merits under *de novo* review.

III. *Ineffective Assistance of Counsel for Amanda's Statement*

Kubsch approaches Amanda's statement from a different angle by arguing that even if his stand-alone claim under *Chambers* fails, his trial counsel provided ineffective assistance by failing to do a better job in trying to have the recording admitted into evidence. The Indiana Supreme Court rejected this claim on appeal from the denial of post-conviction relief, finding that it was barred by the doctrine of *res judicata*. *Kubsch III*, 934 N.E.2d at 1143 n.2.

Under the controlling standard from *Strickland v. Washington*, 466 U.S. 668, 687 (1984), Kubsch must show (1) that his trial lawyers' performance was deficient, meaning that it fell below an objective standard of reasonableness in light of prevailing professional norms, *id.* at 690, and (2) that the deficient performance prejudiced his case, meaning that there is a reasonable probability that, but for the lawyers' unprofessional errors, the result of the proceeding would have been different, *id.* at 694. Kubsch has not made either showing.

The Indiana Supreme Court's *res judicata* holding was reasonable as far as it went. To the extent that Kubsch was arguing that the recorded interview should have been admitted and would have made a difference in the trial, the state court had already decided those questions against Kubsch in the direct appeal. *Kubsch II*, 866 N.E.2d at 734–35. A post-conviction petitioner cannot avoid claim preclusion

by merely repackaging an earlier claim. E.g., *Reed v. State*, 856 N.E.2d 1189, 1194 (Ind. 2006).

Kubsch's post-conviction argument on this score was not, however, merely a repackaging of the claim that the recording should have been admitted as evidence. He also argued and tried to offer evidence that if his trial lawyers had taken some additional steps, the interview would have been admitted into evidence and was reasonably likely to change the jury's verdict. The state court's *res judicata* holding did not engage that evidence and argument.

Even if we review this claim *de novo*, however, Kubsch has not shown that his trial lawyers were constitutionally deficient. It is not as though the trial lawyers overlooked the issue. Several months before the second trial, Amanda testified in a deposition where her mother was also present. See Tr. 2983–84; 3013. We do not have that transcript, but the lawyers obviously did. And they had the opportunity to talk to Amanda's mother Monica as well. The lawyers made clear in their post-conviction testimony that they had no real interest in anything Amanda or Monica might say from the witness stand; they wanted the recording in evidence. PCR Tr. 106; Tr. 3028.

The trial transcript shows they worked hard to convince the trial court to admit the recording. See Tr. 2982–90; 3010–35; 3112–23. They were not successful because they could not lay a sufficient foundation to admit the recording under Rule 803(5) as recorded recollection, and as explained above, the inability to use it to impeach the non-inculpatory "probably didn't see him" portion of Amanda's brief trial testimony was harmless. To change this result, Kubsch needed to come forward in the post-conviction proceedings with evi-

dence or new legal arguments that were available to his trial lawyers, clearly should have been presented, and were reasonably likely to turn the tide. As the district court explained, he failed to do so. *Kubsch*, 2013 WL 6229136, at *39–40.

Kubsch criticizes his trial lawyers for having failed to correct or challenge what he says is misinformation about the reports that Amanda and her mother had been mistaken in their interview with Sergeant Reihl, and argues that they should have investigated in more detail her mother's statement of March 2000 asserting that they had mixed up Thursday and Friday in the videotaped interview. Kubsch has not shown what that further investigation would have uncovered, let alone how it would have helped him.

Contrary to the dissent's assertion, the trial judge did not keep out Amanda's videotaped statement because he thought it would have been easily impeached. When the prosecution and defense were debating the admissibility of the statement before the trial court, the prosecutor argued against admitting the statement "full well knowing that the little girl was mistaken" and that her mother would testify to that effect. Tr. 3015–16. The trial judge immediately responded: "The jury judges that. The jury judges if the girl is right or the mother is right." Tr. 3016. The judge kept the recorded hearsay statement out as substantive evidence because it did not qualify as a recorded recollection, and he kept it out as impeachment because Amanda had said nothing worth impeaching.

In this appeal, the specific criticisms of counsel, by both Kubsch and our dissenting colleague, are based on speculation rather than the sort of evidence needed to support the

claim. Kubsch developed the factual record for this claim of ineffective assistance of counsel in a three-day evidentiary hearing in a state trial court in 2008. That is the record before us on this question. See *Cullen v. Pinholster*, 563 U.S. —, 131 S. Ct. 1388, 1398 (2011); 28 U.S.C. § 2254(d)(2) & (e).

Kubsch's new lawyers called both of his trial lawyers as witnesses in the post-conviction hearing. The transcript shows that they were asked a few questions about Amanda's recorded interview and her mother's statement from March 2000, but there simply was no inquiry into the lawyers' supposed "failures" on this score. Nor was there any effort to show what would have happened if the trial lawyers had done what Kubsch's new lawyers argue should have been done. They did not call Amanda or Monica or anyone else to fill in the factual gaps. That proceeding and that hearing were Kubsch's opportunity to make a factual record showing deficient performance that was harmful to his case. He simply did not make that showing.

Our dissenting colleague finds the trial lawyers deficient in some additional ways: for not having asked Amanda if her statements in the interview were accurate, if she was actually the girl shown in the video, and if she would have told the police the truth; and for having failed to challenge Lonnie Buck's account of the correction on the date, to call Monica to corroborate Amanda's answers in the interview, to track down bank records for Monica's deposit of her paycheck, and to pursue corroboration about the school field trip. Post at 87–88. But again, there is no factual record to support such speculation about what these efforts would have shown. Kubsch's post-conviction lawyers did not question his trial lawyers on the witness stand about these mat-

ters, nor did they track down and offer the evidence that the dissent says might have helped.

This is not to suggest that Kubsch's post-conviction lawyers were themselves anything other than highly competent and diligent. Kubsch is now being represented by at least his sixth team of capable and experienced capital defense lawyers. See Ind. R. Crim. P. 24 (qualifications and compensation for trial and appellate counsel in capital cases). The post-conviction lawyers (the fifth team) no doubt investigated this claim as thoroughly as possible. But when the time came to offer actual evidence about the results of the investigation, they simply did not have evidence that the dissent says should have been "easily within reach." We cannot grant relief by filling in the gaps with our own speculation that further investigation would have been sufficiently helpful to Kubsch's defense.

IV. *Waiver of Counsel at the Penalty Phase*

We turn now to Kubsch's third principal claim on appeal. At the penalty phase of the trial, Kubsch waived his right to counsel and represented himself. He chose not to present any mitigating evidence. He did make a statement to the jury in which he said the murders were a "horrific nightmare" for which the death penalty would be appropriate, but he also continued to assert his innocence. On direct appeal and federal habeas review—though not in the intervening state post-conviction proceeding—he has argued that his waiver of counsel was not sufficiently knowing and intelligent because he was not "made aware of the dangers and disadvantages of self-representation." See *Faretta v. California*, 422 U.S. 806, 835 (1975).

The Indiana Supreme Court considered and rejected the claim. *Kubsch II*, 866 N.E.2d at 735–38. That decision was not an unreasonable application of federal law under the circumstances of this case. See 28 U.S.C. § 2254(d)(1). Kubsch made clear that he was waiving counsel because he did not want to present evidence at the sentencing phase of the trial. That decision simplified substantially the challenge of representing himself, so the trial judge's colloquy was sufficient under the circumstances. Neither *Faretta* nor any other Supreme Court decision required the judge to discourage Kubsch from making his decision to waive counsel.

A. *The Constitutional Standard*

We first address the constitutional standard before turning to its application in this case. *Faretta* established that "a defendant in a state criminal trial has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so." 422 U.S. at 807. Though "he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Id.* at 834, quoting *Illinois v. Allen*, 397 U.S. 337, 350–351 (1970) (Brennan, J., concurring). *Faretta* also cautioned that when "an accused manages his own defense" he forgoes "many of the traditional benefits associated with the right to counsel." *Id.* at 835. Respect for the value of these "relinquished benefits" is why "the accused must knowingly and intelligently" waive the right to counsel. *Id.* (internal quotation marks omitted), citing *Johnson v. Zerbst*, 304 U.S. 458, 464–65 (1938).

"The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding

that case, including the background, experience, and conduct of the accused." *Johnson*, 304 U.S. at 464. Two other relevant "case-specific factors" are "the complex or easily grasped nature of the charge" and "the stage of the proceeding." *Iowa v. Tovar*, 541 U.S. 77, 88 (2004). To determine whether a defendant has knowingly and intelligently waived the right to counsel, "a judge must investigate as long and as thoroughly as the circumstances of the case before him demand." *Von Moltke v. Gillies*, 332 U.S. 708, 723–24 (1948).

Both the Indiana Supreme Court and this circuit consider four factors in the waiver inquiry: "(1) the extent of the court's inquiry into the defendant's decision, (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed *pro se*." *Kubsch II*, 866 N.E.2d at 736, quoting *Poynter v. State*, 749 N.E.2d 1122, 1127–28 (Ind. 2001), quoting in turn *United States v. Hoskins*, 243 F.3d 407, 410 (7th Cir. 2001).

The constitutional standard is flexible, and its application must be adapted to the case. The Supreme Court has not prescribed a list of admonitions that must be given to all defendants who want to waive counsel. See *Tovar*, 541 U.S. at 92 (reversing state court's finding that waiver was invalid: "In prescribing scripted admonitions and holding them necessary in every guilty plea instance … the Iowa high court overlooked our observations that the information a defendant must have to waive counsel intelligently will depend, in each case, upon the particular facts and circumstances surrounding that case.") (citation and internal quotation marks

omitted); see also *United States v. Moya-Gomez*, 860 F.2d 706, 733 (7th Cir. 1988) ("Although we stress the need for a thorough and formal inquiry as a matter of prudence and as a means of deterring unfounded claims on appeal, we shall not reverse the district court where the record as a whole demonstrates that the defendant knowingly and intelligently waived his right to counsel."); *United States v. Egwaoje*, 335 F.3d 579, 585 (7th Cir. 2003) (reaffirming this holding of *Moya-Gomez*). The extent and formality of the waiver colloquy are relevant, but it is the waiver itself, not the waiver colloquy, that is the proper focus of the inquiry.

This constitutional standard does not impose a separate duty to discourage a defendant from representing himself. If a defendant is not already "aware of the dangers and disadvantages of self-representation," then the trial court must educate him so that he is aware of those risks when he decides. *Faretta*, 422 U.S. at 835. When a defendant wants to take on the challenges of representing himself at trial, including dealing with jury selection, presentation of evidence, and jury instructions, the judge may and usually will try to discourage that option as a means of forcing the defendant to think carefully about unfamiliar risks.

We find no Supreme Court decision, however, requiring a judge to discourage self-representation in all circumstances. If a judge believes, as the trial judge did here, that the defendant is making a knowing and intelligent waiver, then she would commit constitutional error by discouraging that decision too strongly. *Faretta* clearly established the constitutional right to self-representation. "That right is not honored if judges must depict self-representation in such unremittingly scary terms that any reasonable person would refuse."

*United States v. Oreye*, 263 F.3d 669, 672 (7th Cir. 2001), quoting *United States v. Hill*, 252 F.3d 919, 928–29 (7th Cir. 2001).

When a defendant raises the possibility of representing himself, the trial court is placed "between the Scylla of trammeling the defendant's constitutional right to present his own defense and the Charybdis of shirking its 'constitutional duty to ensure that the defendant only represents himself with full awareness that the exercise of that right is fraught with dangers.'" *United States v. Sandles*, 23 F.3d 1121, 1127 (7th Cir. 1994) (citation omitted), quoting *Moya-Gomez*, 860 F.2d at 732. Appellate courts have tried to keep the permissible middle ground between these opposing errors fairly broad, allowing trial judges reasonable leeway to adapt the inquiry to the circumstances of the case without requiring a script or checklist. Trial judges seeking this middle way are not constitutionally bound to discourage every defendant from representing himself no matter the facts and circumstances of the case.

B. *Kubsch's Waiver of Counsel*

With this constitutional standard in mind, we turn to the facts of Kubsch's waiver of his right to counsel for the sentencing phase of his trial. The attorneys who represented Kubsch at the guilt phase of his trial were a veteran team who qualified as a capital defense team under Indiana Rule of Criminal Procedure 24, which sets minimum qualifications for lead and co-counsel in capital cases. During the sentencing phase they served as Kubsch's legal advisors by court appointment. Kubsch could ask them for advice, but they could no longer speak for him in court.

Kubsch represented himself at the sentencing phase of his trial because he did not want to present mitigating evidence. Kubsch was advised by the court and counsel that if his counsel had represented him in the sentencing phase, his counsel would have made the final decision about which witnesses to call. His attorneys planned to offer mitigating evidence, and they named the witnesses they would have called and provided Kubsch a written summary of that evidence. The court asked Kubsch whether he wanted any of those witnesses to be called. Kubsch confirmed that he did not.

The court then told Kubsch what to expect in the sentencing phase of the trial if, as both sides planned, he and the State presented no new evidence. Each side would address the jury, and the court would instruct the jury on the applicable sentencing law, including relevant aggravating and mitigating factors. The court told Kubsch that as his own attorney he would have the right to address the jury directly.

Finally, the court considered the standard advice and warnings given to defendants deciding whether to represent themselves. The court noted that nearly all the advice and warnings concern the challenges of trial, such as selecting jurors and presenting evidence, which can be difficult without legal training and experience. The court pointed out that if the sentencing phase did not include additional evidence, the most difficult obstacles for a *pro se* defendant would not be present. The court then reiterated that Kubsch had the right to make a statement to the jury and allowed his attorneys to withdraw their appearances.

Kubsch now argues that his waiver was not knowing and intelligent because the court's colloquy was insufficient and

because the judge did not attempt to discourage his choice. The Indiana Supreme Court considered these arguments in detail and in light of the circumstances of this case, particularly Kubsch's reasons for wanting to represent himself and the stage of the proceeding, where he would only make a statement to the jury about the appropriate penalty. *Kubsch II*, 866 N.E.2d at 735–38.

The Indiana Supreme Court noted that Kubsch himself "eliminated the need" for almost all of the standard advisements given to defendants deciding whether to represent themselves by confirming that he did not wish to present evidence at the sentencing phase of his trial. *Id.* at 736. Accordingly, the waiver colloquy was "sufficient to apprise the defendant of the dangers he is facing in the particular matter at hand." See *id.* All that remained in the trial, as a practical matter, was a closing argument on whether the death penalty should be imposed.

The stakes were as high as they come in a trial, but they were highest for the man who wanted to speak for himself. The *Faretta* right of self-representation is founded upon respect for the autonomy of the defendant:

> The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law."

422 U.S. at 834.

The state court also noted the trial judge's observation about Kubsch's competence at the end of this three-week trial:

> I want to state for the record, in this case, that the Court observed Mr. Kubsch throughout trial, that during trial he pretty much constantly was able to confer with his attorneys, was able to confer with his factual investigator that interviewed witnesses in this case, that he testified in this case, that the Court found his testimony to be coherent and relevant to the facts of this case, and that the Court has no reason to doubt Mr. Kubsch's competency to represent himself in this matter.

Tr. 3339–40, quoted in *Kubsch II*, 866 N.E.2d at 737. The state court quoted this observation to help show that Kubsch was capable of understanding, and did in fact understand, the decision he was making. It also pointed out that "at the time he chose to represent himself, Kubsch had already participated in two murder trials and one penalty phase." *Kubsch II*, 866 N.E.2d at 738. "In other words, he obviously knew from his own experience of his right to call witnesses, present other evidence, and propose mitigating factors." *Id.*

Finally, the Indiana Supreme Court viewed Kubsch's decision to waive counsel as knowing because it was strategic, intended to prevent his counsel from calling witnesses in the penalty phase of the trial. *Id.*, citing *United States v. Todd*, 424 F.3d 525, 533 (7th Cir. 2005). "Choosing to waive counsel because one does not agree with trial strategy is perhaps not

the best choice, or even a good choice, but it can be a rational choice." 866 N.E.2d at 738.

Citing John H. Blume, *Killing the Willing: "Volunteers," Suicide and Competency*, 103 Mich. L. Rev. 939 (2005), Kubsch argues now that his decision was not so much strategic as suicidal, calculated to bring about his own execution and indicating "a pre-existing mental illness." That is indeed one way to understand Kubsch's behavior. Another way to understand Kubsch's behavior, however, is to take at face value his words at the sentencing phase of both trials. At both he articulated a principled opposition to arguing that any mitigating evidence could outweigh the aggravating circumstances of the crimes a jury had convicted him of committing. *Faretta* was decided precisely to protect such principled decisions. Kubsch now apparently regrets his decision to proceed *pro se*. That does not mean his decision was any less principled when he made it or that it was the product of mental illness.

His strategy can also be understood in quite sensible terms. Rather than begging for mercy from the jury that had just convicted him of three brutal murders without any apparent mitigating circumstances, Kubsch told the jury, "I wouldn't even dare try to insult your intelligence by wasting your time by presenting mitigation." Tr. 3372. He instead asserted several times that he is innocent. His approach can be understood as a reminder that the jurors should consider the possibility that they might have made a mistake, so that residual doubt should weigh against the death penalty. That approach is entirely consistent with his defense at trial, even though neither was successful. The state courts did not act unreasonably in viewing the waiver as strategic and know-

ing. See *United States v. Davis*, 285 F.3d 378, 384–85 (5th Cir. 2002) (defendant chose to represent himself at sentencing phase of capital trial for similar strategic reason; appellate court issued writ of mandamus barring district court's appointment of independent counsel to present mitigating evidence over defendant's objection).

Kubsch argues most strenuously that the trial judge had a duty under "the spirit of *Faretta*" to discourage him from waiving his right to counsel. That is not what *Faretta* said or means. *Faretta* held that a defendant has a constitutional right to waive counsel as long as the waiver is knowing, voluntary, and intelligent. The core of *Faretta* is respect for the defendant's autonomy even if he makes a foolish decision. 422 U.S. at 834; see also *Davis*, 285 F.3d at 384. There is no requirement to discourage the defendant. As noted, we have warned that excessive discouragement, even for a defendant who wishes to handle the entire case, can violate *Faretta*. See *Hill*, 252 F.3d at 929 ("A defendant bullied or frightened into acquiescing in a lawyer that he would rather do without would be in a much better position to say that the choice was not made knowingly or intelligently.").

The basic problem with Kubsch's argument is that most of the specific advice usually given to defendants was unnecessary for him. He planned to present no mitigating evidence and planned only to make a brief statement to the jury. Cf. Federal Judicial Center, Benchbook for U.S. District Court Judges § 1.02 (6th ed.) (warnings focus on procedural and evidentiary challenges before and during trial).

Kubsch responds that this view "shifts responsibility from the trial court to the defendant, making the defendant responsible to inform the court how he wished to proceed, to

determine the level of warning the court must give him."
The Indiana Supreme Court did not make that mistake.
Kubsch's counsel and then Kubsch himself explained his
plans to the trial judge. The judge was not required to ques-
tion Kubsch's strategy, and he did not require Kubsch to
provide information. Kubsch volunteered it. The trial judge
adapted his approach to the waiver inquiry accordingly.

In a variation on this argument, Kubsch also argues that
the waiver colloquy was actually misleading. At one point,
the trial judge said, "In a way I'm saying, your representa-
tion would not be as complicated as if you were handling the
whole trial by yourself. Do you understand that?" Tr. 3342.
Taken in context, this statement was not misleading at all. It
was true. Making a statement to the jury was far simpler for
Kubsch than representing himself in the guilt phase of his
trial would have been. See *Tovar*, 541 U.S. at 88 (explaining
that the "information a defendant must possess in order to
make an intelligent" waiver depends in part on "the stage of
the proceeding").

In sum, the federal Constitution required the trial judge
to determine whether Kubsch's waiver of counsel for the last
phase of his trial was knowing, voluntary, and intelligent.
The Indiana Supreme Court did not apply that clearly estab-
lished federal law unreasonably by holding that Kubsch's
waiver was valid in light of "the particular facts and circum-
stances surrounding that case, including the background,
experience, and conduct of the accused," see *Johnson*, 304
U.S. at 464, and the stage of the proceeding, see *United States
v. Hoskins*, 243 F.3d at 410.

Accordingly, we AFFIRM the district court's judgment
denying relief.

WOOD, *Chief Judge*, dissenting. My colleagues are prepared to send Wayne Kubsch to his death on the basis of a trial at which the jury never heard critical evidence that, if believed, would have shown that Kubsch was not the man responsible for the horrible murders of his wife Beth, her son, Aaron Milewski, and her ex-husband, Rick Milewski. I am not. They concede that the evidence against Kubsch was entirely circumstantial. While there is nothing wrong with circumstantial evidence, it is impossible to have any confidence in a verdict rendered by a jury that heard only part of the story. In my view, the state courts have reached a result that is inconsistent with, and an unreasonable application of, the United States Supreme Court's decision in *Chambers v. Mississippi*, 410 U.S. 284 (1973). Had the contested evidence been admitted under the *Chambers* exception to the normal rules of evidence, a properly instructed jury may have acquitted Kubsch. It also may have convicted him: I do not argue that the state courts wrongly viewed the evidence as sufficient for conviction. But that is not the question before us. The question is whether Kubsch was able to present his entire case and obtain a reliable jury verdict. Because I believe that he was deprived of this essential protection, I would grant the writ and give the State of Indiana a new opportunity to try him.

## I

As required by the Antiterrorism and Effective Death Penalty Act, I rely on the facts used by the Supreme Court of Indiana after Kubsch's second trial, conviction, and sentencing. See *Kubsch v. State*, 866 N.E.2d 726 (Ind. 2007) (*Kubsch II*). That opinion summarized the facts that had been developed in earlier appeals. See *Kubsch v. State*, 784 N.E.2d 905

(Ind. 2003) (*Kubsch I*); see also *Kubsch v. State*, 934 N.E.2d 1138 (Ind. 2010) (*Kubsch III*) (opinion at post-conviction stage).

Wayne and Beth Kubsch were married in November 1997. It was a second marriage for both: Beth had two sons, Aaron Milewski, from her previous marriage to Rick Milewski, and Anthony Earley; and Kubsch had a son, Jonathan, who lived with his mother, Tina Temple. Aaron lived with Rick in South Bend, Indiana, while Anthony lived with Kubsch and Beth in nearby Mishawaka. Kubsch owned the family home, and he also owned 11 rental properties in St. Joseph County. They were encumbered by mortgages totaling approximately $456,000 as of mid-1998. Kubsch also had credit-card debt exceeding $16,000. He tried paying that off by refinancing four of his rental properties, but by August 1998 the credit-card debt had reached $23,000, and by September Kubsch was falling behind in his mortgage and tax payments. At about that time, he bought a life insurance policy on Beth, with himself as the sole beneficiary; the policy would pay $575,000 on her death.

The fateful day was September 18, 1998. For ease of reference, I provide a timeline of the events in Appendix A to this dissent. Here I summarize what happened that day and the evidence that pins down where the key actors were located. I rely on the evidence that was admitted at Kubsch's second trial.

That morning, both Wayne and Beth Kubsch were up early. By 6:00 a.m., testimony from Beth's coworker Archie Fobear established that Beth had already left her home on Prism Valley Drive in Mishawaka and was just starting to work at United Musical Instruments in Elkhart, Indiana, ap-

proximately 11 miles away. Cellular telephone records indicated that Kubsch made a call at that time from the sector just adjacent to the one covering the home. He was driving to his place of employment at Skyline Corporation, also in Elkhart; he punched in at 6:50 a.m. Cell records show that Kubsch made a telephone call at 9:11 a.m. somewhere near his workplace, and that he made another call at 10:45 a.m. from Skyline's break room. The latter call was to the home, presumably to Beth, who had finished her shift at 10:00 a.m., returned home, and paged him twice from home around 10:30 a.m.

At 10:48 a.m., a five-minute call was placed from the Kubsch home to the home of Rick Milewski. At that point Beth left the house to run some errands. A security camera at the Teacher's Credit Union shows Beth, along with her dog, in her car at a drive-up window at 11:08 a.m. There is a credit union receipt stamped 11:14 a.m. confirming a completed transaction. A little while later, at 11:52 a.m., Beth was with credit counselor Edith Pipke at the Consumer Credit Counseling Agency in South Bend. No evidence admitted at the second trial indicated where she was after she left the credit union and before she arrived for her appointment.

In the meantime, Kubsch drove back to the Prism Valley house after punching out from his job at 11:13 a.m. Erin Honold, a neighbor, saw him and his car in the driveway between 11:30 a.m. and noon, around the same time when Beth was speaking with the credit counselor. Telephone records from the house indicate that a call was made at 11:37 a.m. to American General Finance; Kevin Putz, an employee of the company, testified that he spoke to Kubsch that morning. Between 12:09 and 12:11 p.m., Kubsch made three more calls

using his cellphone, one to the house (implying that he was no longer there) and two to Rick Milewski. He apparently interrupted Rick while Rick was speaking with his brother Dave about an upcoming hunting trip. Dave testified that Rick said that Kubsch was calling to discuss moving a refrigerator at the Prism Valley house.

Beth paged Kubsch again at 12:16 p.m.; cell records indicate that at 12:18 p.m., he called the house for 31 seconds from the vicinity of Osceola, a town between Mishawaka and Elkhart. Kubsch returned to Skyline, although he did not punch back in. He made two phone calls from the break room, one at 12:40 p.m. and the other at 1:17 p.m. Between those calls, Rick called Beth at 12:46 p.m. Kubsch punched out of work again, this time for the day, at 1:53 p.m. A minute later, he called the house from Elkhart and was on the line for 46 seconds. The next call from Kubsch's cellphone came at 2:51 p.m.; it was from a sector near the house. The state's theory was that these last two calls bracket the time when he committed the murders—between 1:53 and 2:51 p.m.

There are some problems with this theory, at least if it is meant to encompass all three murders, because there is no evidence that Aaron left school early that day. To the contrary, witnesses testified that Aaron was waiting outside Lincoln Elementary School in South Bend and that Rick picked him up there between 2:20 and 2:35 p.m. (The school is now called Lincoln Primary Center; its website indicates that the school day runs from 8:15 a.m. to 2:20 p.m. See LINCOLN PRIMARY CENTER, https://www.edline.net/pages/Lincoln_Primary_Center (last visited Aug. 10, 2015).) In any event, by 3:15 p.m. or so, Kubsch placed numerous calls to Beth's

mother, Diane Rasor; he eventually connected on the 11th try. Cellular records indicate that he was heading north at that point, toward the Michigan border.

Between 4:42 and 4:47 p.m. Indiana time, Kubsch made some calls picked up by the cell tower in Schoolcraft, Michigan, which is about 11 miles north of Three Rivers, Michigan, where Kubsch's son Jonathan lived with his mother. (For the sake of consistency, I use Indiana time throughout this account; in fact, though most of Indiana and most of Michigan are in the Eastern time zone, Indiana in 1998 had not yet adopted Daylight Savings Time; thus Indiana was on Eastern Standard Time in September 1998, while most of Michigan, including Three Rivers and Schoolcraft, was an hour ahead on Eastern Daylight Time.) Around 5:00 p.m., Kubsch picked up Jonathan; he also said hello to his friend Wayne Temple around 5:30 or 5:45 p.m. at the local Kmart store. He then headed back to Osceola with Jonathan, stopping for ten minutes at the home of Constance Hardy, the mother of his friend Brad. At 5:56 p.m., he made a call from the cellular region close to the Prism Valley house.

By this time, however, Anthony had come home and discovered the bodies of Rick and Aaron. This happened at 5:30 p.m. He immediately summoned help, and so by the time Kubsch showed up at the house at 6:45 p.m., police were there and it was taped off as a crime scene. (Beth's body had not yet been discovered.) The police took Kubsch to the station, interviewed him, and then released him. Around 9:00 p.m., they discovered Beth's body concealed in the basement. They brought Kubsch back in for a second interview. He did not appear surprised to learn of Beth's death. Asked several times by the officers to tell them what happened,

Kubsch chose instead to invoke his right not to speak with-
out an attorney. The police did not arrest him for the murder
immediately. They did so three months later, when a person
named Tashana Penn Norman told them that she and her
boyfriend overheard a person saying that he had "hurt[ ] a
little boy," and she identified Kubsch as the speaker. He was
arrested on December 22, 1998, and charged with all three
murders.

## II

### A

Kubsch was tried twice in this case. The first trial took
place in 2000. At its conclusion, the jury convicted him and
recommended the death penalty, and the court sentenced
him accordingly. The Supreme Court of Indiana reversed
that judgment in *Kubsch I*, and ordered a new trial. 784
N.E.2d at 926. The second trial took place in March 2005.
Once again, the jury found Kubsch guilty and recommended
the death penalty, and once again, the trial court accepted
the recommendation and imposed that sentence. In *Kubsch
II*, the Supreme Court of Indiana affirmed. 866 N.E.2d at 740.
Kubsch then unsuccessfully sought post-conviction relief
from the state courts, see *Kubsch III*, 934 N.E.2d at 1154, be-
fore turning to the federal court with his current habeas cor-
pus petition, see 28 U.S.C. § 2254.

The State's case, as my colleagues readily admit, was
built from various pieces of circumstantial evidence. It
pointed to Kubsch's financial problems and the new life in-
surance policy on Beth as plausible motives for the murders.
It attempted to trace his movements through use of the cellu-
lar telephone records and the testimony of the people who

interacted with Kubsch, Beth, Rick, Aaron, and Anthony throughout that day. It found a fiber on the duct tape used to bind Beth's body that matched a fiber taken from Kubsch's car, and it also noted that the duct tape wrapper in the car matched the brand of tape used on Beth. (It offered nothing to show how common this brand was.) It (as have my colleagues) stressed the fact that Kubsch's account of his own actions during the day was not consistent on key matters, such as whether he went home during the lunch hour, whether he was alone there, and when he headed up to Michigan. These inconsistences, plus what the district court called a "slow-moving accumulation of a glacier of circumstantial evidence," satisfied both the second jury and all of the reviewing courts so far that Kubsch was properly convicted and sentenced.

B

If the question before this court were simply about the sufficiency of the evidence, I would agree with everyone that Kubsch's challenge fails. Indeed, it would be hard to find fault with the extensive discussion my colleagues have furnished. But that is not the question. It is instead whether the package of evidence that was presented to the jury was complete, and if not, whether the excluded evidence was important and reliable enough to have made a difference.

The critical evidence that was kept from the jury was videotaped testimony by a girl named Amanda ("Mandy") Buck, "who, according to the defense, would have testified that she saw Aaron after 3:30 pm on the day of the murders." *Kubsch II*, 866 N.E.2d at 730. Mandy, who was nine years old at the time, was interviewed immediately after the murders, on Tuesday, September 22, 1998. Because of the

importance of what she said, I have included a full transcript of the interview as Appendix B to this dissent. The interviewer was Detective Mark Reihl; the interview took place in what appears to be a room in the police station. Mandy's mother, Monica, was present throughout and volunteered information from time to time.

After establishing some basic information, Detective Reihl confirmed that Mandy was a fourth-grader at Lincoln School, that she lived right across the street from Aaron and his dad Rick, and that she and Aaron were "best friends." She commented that Aaron didn't like Kubsch, because he would get rough and punch too hard "and stuff like that." She saw Aaron frequently: "I always went over to his house. He always came over to my house and like we like used to study for the same spelling words. … And we would help each other on homework and stuff." When Reihl asked her when they got out of school, she replied "two twenty." She lived close to the school, she said, just a five-minute walk away.

The interview then turned to "last Friday," which was September 18, the day of the murders. On that day, as usual, Mandy was picked up from school by the Alphabet Academy; from there, her mother typically (and that day) picked her up to go home "[b]etween three thirty and quarter to four." At that point Monica interjected that she "waited for [Monica's] mom and dad to get home, and I went and cashed my check and came home." Reihl then asked whether Monica noticed if Rick was across the street. Monica replied "I didn't pay no attention. All I saw was Aaron." Reihl repeated "You saw Aaron?," and Monica said "[m]mm hmm." She did not remember if Rick's truck was there. Turning

back to Mandy, Reihl asked again what time she got home that day. Monica answered instead, repeating "3:30 or quarter to four." Mandy confirmed that she saw Aaron then, and that she also saw "his dad," who "was coming from their living room into the kitchen to get something to drink." She explained that she was able to see this from her own house: "every day when I walk home I always see Rick walk into the kitchen or walk into the restroom or walk into his room." Asked what kind of car Rick drove, Mandy replied "[a] Chevy? He used to drive a Chevy until it broke down." She specified that it was a black, medium-sized, "kinda short" truck. Because his truck had broken down, she added that he was driving a white truck that he had borrowed from his brother on Friday, and that the white truck was at the house when she got home from school.

Reihl next asked whether she saw Rick and Aaron leave that afternoon. She answered, "Um, yeah, like I was on my porch and, and they let me blow bubbles and I was blowin' my bubbles, and I seen Rick pull out and leave." She was not sure what time that was, because she left her watch in her gym bag, but she estimated it was a "medium" time after she got home, and she commented that "it takes a pretty long time to get to [Aaron's] mom's house."

She then went into some detail about Aaron's plans for the weekend. "He said that he was going to his mom's house Friday, 'cause he was gonna stay the night there to go to the field trip Saturday. … You know he was, he—he wanted to go on the field trip bad. … But by the time Saturday when we, when we were on the bus and stuff, he was gonna be in our group, and, um, he never showed up. He wasn't there. And we didn't know why." She went camping after the field

trip and told her grandmother that she had not seen Aaron. She learned about the murders after a news crew came to her home while she was at her karate lesson the following Monday, she said.

Reihl then turned back to Monica and confirmed that she cashed her paycheck on Friday, shortly after she came home from work (around 3:50 p.m.). She said again that she had seen Aaron, but not Rick, and that she did not look to see if Rick's truck was there. They discussed what kind of truck Rick drove; interestingly, Mandy knew more about it than her mother—she liked the gold printing that said "Chevrolet" across the back. By then, the interview was winding down. Reihl asked Mandy yet again whether she saw both Aaron and his father, as well as the white truck, in the yard around 3:30 or 3:45 p.m., and she said yes. He asked whether "[t]hese times that you've given me today, uh, these are pretty accurate," and Monica said, "Yeah, 'cause I get off work at quarter after three." This was her daily routine. With that, the interview ended.

A few days after Mandy's interview, Reihl called Monica's place of employment and then her home, apparently in an attempt to see yet again whether both Mandy and Monica had correctly recounted what happened and when it happened. Reihl spoke to Mandy's grandfather ("Lonnie") and asked him to find out if Mandy and Monica were certain about their story. Lonnie called Reihl back and told him that the events that Mandy and Monica had described had taken place on Thursday, September 17, not on Friday. The prosecutors recounted at Kubsch's trial that Monica told the police that "her father was at her house on that Thursday, and he later reminded her that it was Thursday instead of Friday."

She said that she—Monica—had confused the dates because she was so busy; she offered no reason why Mandy would have confused them. Nor was there any effort to explain away Mandy's detailed comments about the timing of the Saturday field trip and her subsequent camping trip, karate lesson, and so on. At that early time, not a week after the field trip, it would have been easy to confirm with the school whether the trip took place on Saturday, September 19, or Friday, September 18. (And even the trial evidence shows Rick picking up Aaron at school between 2:20 and 2:35 p.m. on Friday, strongly suggesting that there was no field trip that day.) In addition, it would have been relatively easy to confirm when Monica was paid and made her deposit, just as evidence had shown when Beth visited her own bank.

Mandy was called to testify at the second trial, but she had almost nothing to say. She claimed to have no memory of talking to the police or being interviewed by them in 1998. When Kubsch's lawyer attempted to use the transcript of the interview to refresh her recollection and later to impeach her, the prosecution objected and the court sustained the objections. The court also refused to permit the use of the videotaped interview as a recorded recollection, despite Mandy's asserted inability to recall anything about the interview.

## C

The Supreme Court of Indiana upheld the trial court's rulings. It found that the videotape was not admissible under Indiana's evidentiary rule governing the use of recorded recollection, Ind. R. Evid. 803(5). In 2005 that rule covered:

> [a] memorandum or record concerning a mat-
> ter about which a witness once had knowledge
> but now has insufficient recollection to enable
> the witness to testify fully and accurately,
> shown to have been made or adopted by the
> witness when the matter was fresh in the wit-
> ness's memory and to reflect that knowledge
> correctly … .

(It essentially tracks Fed. R. Evid. 803(5), as it read before the 2011 restyling changes were made.) The court was concerned about the final element, which requires that the recording reflect the witness's knowledge correctly. It found that Mandy's inability to vouch for the accuracy of her prior statement precluded its use. The videotape was not admissible as a prior inconsistent statement, the court added, because Mandy gave no substantive evidence at all in her testimony, and so there was (almost) no prior statement to impeach.

The court conceded, however, that there was one statement that was subject to impeachment. At the trial, Mandy stated that "I probably didn't see [Aaron], because I go straight [from] home to the day care, and then I would go home afterwards." That statement directly contradicts her statement in the video that she saw Rick and Aaron that afternoon from her porch, and the court acknowledged that "Kubsch should have been allowed to impeach her on this matter." 866 N.E.2d at 735. It found the error harmless, however, because it thought that Mandy's account from the videotape would have been impeached by the call from her grandfather suggesting a mistake in dates. It thought that the prosecutor's ability to put Detective Reihl and Monica on

the stand, presumably to support the "mistake" theory, was "also the reason why Kubsch's claim that he was denied his federal constitutional right to present a defense fails. See *Chambers v. Mississippi*, 410 U.S. 284 (1973) (protecting defendant's due process right by recognizing an exception to application of evidence rules where evidence found to be trustworthy)." 866 N.E.2d at 735 n.7. At a minimum, this passage conclusively shows that the *Chambers* argument was adequately presented to the state courts.

Putting to one side for the moment the niceties of the rules of evidence, one thing is clear: if Mandy was correct in her videotaped interview that the events she was describing had happened on Friday, not on Thursday, and if she had seen both Aaron and Rick as late as 3:45 or 4:00 p.m. that day, then Wayne Kubsch could not have killed them. By that time, he was headed to Michigan to pick up Jonathan. The state has always pegged the time of the murders to midday, from 1:53 to 2:51 p.m. It has never argued that Kubsch arranged for someone else to commit the murders on his behalf, and it is obviously too late in the day to introduce such a radically different theory. And, because the state's theory is that Kubsch killed Aaron and Rick because they stumbled on him as he was murdering Beth, Mandy's testimony undermines the conviction as it relates to Beth, too.

No evidence could be more critical to Kubsch's defense. And the possibility that the state might have been able to impeach the videotaped account cannot cure this problem; that impeachment was itself subject to impeachment from such details as the school's records about the day of the field trip and the date when Monica cashed her paycheck. Under these circumstances, the Supreme Court's decision in *Cham-*

*bers* overrides the state evidentiary rule that prevented the jury from hearing Mandy's statement. This was evidence that, if believed, might have prompted the jury to acquit on one or more of the counts. As I explain below, the Indiana Supreme Court's decision to the contrary was, in my view, contrary to and an unreasonable application of *Chambers*, even under the strict standard of review that applies, which my colleagues discuss in such detail despite our agreement on that point.

### III

Habeas corpus petitioners come to a federal court of appeals with at least two strikes against them: they already have lost in the state courts (either on the merits or because of one of many procedural hurdles that must be cleared); and they also have failed to convince the federal district court of their entitlement to relief. They face the daunting burden of satisfying the familiar and deliberately demanding standards created in the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), under which

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see *Harrington v. Richter*, 562 U.S. 86, 102 (2011) ("If this standard is difficult to meet, that is because it was meant to be.").

Kubsch therefore has the burden of showing that the last court in Indiana to speak to his case, see *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991), rendered a decision that was either contrary to, or an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). (He has not sought to rely on 28 U.S.C. § 2254(d)(2), which deals with unreasonable determinations of fact, and so I do not discuss that option here.) As we observed in *Lindh v. Murphy*, 96 F.3d 856, 873 (7th Cir. 1996) (en banc), reversed on other grounds, 521 U.S. 320 (1997), Congress deliberately restricted the jurisprudence to which a court faced with a habeas corpus petition may resort: only federal law as determined by the Supreme Court is available. This restriction acknowledges that the state supreme courts are equally responsible (along with the lower federal courts) for applying federal law, and that the only federal court whose rulings bind them is the federal Supreme Court.

With that in mind, I turn directly to the Supreme Court decision that controls Kubsch's case: *Chambers v. Mississippi*. *Chambers* and the line of cases that follow it "clearly establish" (to use AEDPA's term) the fact that a state rule of evidence cannot be used in a way that denies an accused person his right under the Due Process Clause to a fair trial, in

which he has a fair opportunity to defend. My detailed look at that case and those that followed it demonstrates why, contrary to the spin my colleagues have tried to place on it, the position I take is not opening up any floodgate for the use of hearsay evidence. Only evidence that satisfies the strict criteria of *Chambers* will be admissible, and to see what that evidence must be like, it is necessary to recall the particulars of the case.

Petitioner Leon Chambers was tried by a jury in Mississippi state court and found guilty of murdering a policeman; he was sentenced to life imprisonment. The story leading up to his conviction was sadly familiar. On a Saturday evening, Woodville (Mississippi) police officers Forman and Liberty went to a local bar to execute an arrest warrant for a young man named Jackson. With the help of a hostile crowd and some 20 to 25 men, Jackson resisted arrest. Forman then radioed for assistance, while Liberty retrieved his riot gun from the squad car. Three deputy sheriffs soon arrived in response to Forman's call, but the situation was still not under control. Shooting broke out while Forman was looking away, but when he turned to check on Liberty, he saw that Liberty had been hit several times in the back. Before Liberty died, he turned and fired toward the place where the shots had come from. His second shot hit a man in the crowd in the back of the head and neck; the injured man turned out to be Chambers.

Forman saw neither who shot Liberty, nor whether Liberty managed to hit anyone. A deputy sheriff later testified that he saw Chambers shoot Liberty, and another deputy sheriff testified that he saw Chambers make a suspicious arm movement shortly before the shots were fired. At the

time, however, the remaining officers were trying to tend to Liberty. They put him in the police car and rushed him to a hospital, but he was declared dead on arrival. Chambers in the meantime was lying on the ground. Returning to the scene, some of his friends discovered that he was still alive and took him to the same hospital, where he was treated and then arrested. Later he was charged with Liberty's murder.

Another man, Gable McDonald, was also in the rowdy group at the bar. A few days later, he left his wife in Woodville and moved to Louisiana, where he found work. Five months later, he returned to Woodville to see an acquaintance, Reverend Stokes. After talking to Stokes, McDonald met with Chambers's attorneys and gave them a sworn confession that he was the one who shot Liberty. He also said that he had told a friend, James Williams, that he was the killer. He admitted that he used a nine-shot, .22-caliber revolver, which according to the autopsy was the murder weapon. McDonald signed the confession, surrendered to the police, and was put in jail.

A month later, at the preliminary hearing, McDonald recanted. His new story was that Stokes had persuaded him to make a false confession; the idea, implausible though it sounded, was that Stokes promised he would not go to jail for the crime and that he would share in the proceeds of a lawsuit Chambers planned to bring against the town. The local justice of the peace accepted the recantation and released McDonald.

Chambers's trial took place the next year. He had two theories of defense: first, he tried to show that there was no evidence indicating that he shot Liberty; second, he wanted to show that the real culprit was McDonald. He was stymied

in the latter effort, however, by the confluence of two Mississippi rules of trial procedure. First, because the prosecutor refused to call McDonald as a witness, he was forced to call McDonald himself. This triggered Mississippi's voucher rule, under which the party who calls a witness is forbidden to impeach him. Following that rule, the trial court refused to allow Chambers to treat McDonald as an adverse witness. Second, his effort to use three other witnesses to whom McDonald had confessed was blocked by the hearsay rule. Chambers was prepared to show that each of those three would testify that McDonald unequivocally said that he shot Liberty. Much of their testimony was corroborated.

The Supreme Court found that the combination of these two rules of state procedure resulted in a fundamentally unfair trial for Chambers. The rules rendered him utterly unable to subject McDonald's repudiation and alibi to cross-examination, and they prevented him from putting before the jury the information that would have allowed them to decide whether to believe McDonald. The voucher rule, the Court held, "as applied in this case, plainly interfered with Chambers' right to defend against the State's charges." 410 U.S. at 298. The Court found no need to decide whether that interference alone would have been enough, because it also found that when one added the effects of the hearsay rule to the mix, there was no doubt that Chambers's constitutional rights were violated. It noted that the hearsay statements "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." *Id.* at 300 (spontaneous, corroborated, independent, against McDonald's penal interest). McDonald was present in the courtroom, under oath, and subject to cross-examination. The Court summarized its holding with these

words: "In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.* at 302.

The Court did not abandon *Chambers* the minute it was decided in 1973. To the contrary, as my colleagues concede, over the ensuing years the Court has carefully reviewed a substantial number of cases in which *Chambers* arguments have been made. Some decisions have found that state rules must give way to the fundamental dictates of due process, while others have concluded either that the evidence is not so critical, or that the rule as applied does not deprive the defendant of a fair trial. Even in the latter cases, however, the Court has confirmed its continued adherence to *Chambers*.

For example, in *Nevada v. Jackson*, 133 S. Ct. 1990 (2013), the defendant argued in a sexual assault case that a Nevada statute that precludes the admission of extrinsic evidence for impeachment purposes violated the *Chambers* principle. The Court rejected that argument and held that Nevada was entitled to apply its statute. Nevertheless, however, it said:

> [o]nly rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence. See [*Holmes v. South Carolina*,] 547 U.S. [319], 331 [(2006)] (rule did not rationally serve any discernible purpose); *Rock v. Arkansas*, 483 U.S. 44, 61 (1987) (rule arbitrary); *Chambers v. Mississippi*, 410 U.S. 284, 302–303 (1973) (State did not even attempt to explain the reason for its rule); *Washington v. Texas*, 388

U.S. 14, 22 (1967) (rule could not be rationally defended).

133 S. Ct. at 1992.

Indeed, only three years before *Jackson* the Court found an application of *Chambers* to be so uncontroversial it addressed the matter in a *per curiam* opinion. *Sears v. Upton*, 561 U.S. 945 (2010). In that case, evidence of petitioner Sears's cognitive impairments had not been brought to light in state court during his capital sentencing hearing. The Court first found that the state court had not applied the correct standard for ascertaining prejudice for purposes of a Sixth Amendment claim of ineffective assistance of counsel. *Id.* at 946. It then said that "the fact that some of such evidence may have been 'hearsay' does not necessarily undermine its value—or its admissibility—for penalty phase purposes." *Id.* at 950 (footnote omitted). In the accompanying footnote, it added this: "Like Georgia's 'necessity exception' to its hearsay rules, … we have also recognized that reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule." *Id.* at 950 n.6.

As the citation to *Holmes* in *Jackson* signals, the Court has not shrunk the *Chambers* principle to one that applies only to sentencing proceedings, in which the normal rules of evidence do not strictly apply. In *Holmes,* the question was "whether a criminal defendant's federal constitutional rights are violated by an evidence rule under which the defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." 547 U.S. at 321. Yes, the Court concluded, the defendant's rights are violated by such

an evidence rule, despite the broad latitude that state and federal rulemakers enjoy. It continued as follows:

> Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. … This right is abridged by evidence rules that infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve.

*Id.* at 324 (quotation marks and citations omitted). One of the Court's illustrations of this principle was *Chambers. Id.* at 325.

Naturally, there are cases in which defendants have contended that they should be entitled to the benefits of the *Chambers* rule and the Court has turned them down. See, *e.g., Fry v. Pliler*, 551 U.S. 112 (2007) (cumulative evidence can be excluded); *Clark v. Arizona*, 548 U.S. 735 (2006) (state entitled to limit issues for which evidence of mental illness and capacity may be used); *Oregon v. Guzek*, 546 U.S. 517 (2006) (no right to present evidence at sentencing phase that casts "residual doubt" on conviction); *United States v. Scheffer*, 523 U.S. 303 (1998) (permissible to prohibit defendant in a court-martial from relying on polygraph evidence). But it is no surprise that defendants have tried to test the outer limits of *Chambers*. Sometimes the Court has acknowledged the *Chambers* rule but found other reasons why the defendant could not prevail. See *Taylor v. Illinois*, 484 U.S. 400 (1988) (stressing nevertheless the importance of ensuring that the jury does not decide based on a distorted record). And, in

addition to the cases already discussed, there are others in which defendants have prevailed. See, *e.g.*, *Rock v. Arkansas*, 483 U.S. 44 (1987) (refusing to allow Arkansas to use a *per se* rule excluding all hypnotically refreshed testimony); *Crane v. Kentucky*, 476 U.S. 683 (1986) (exclusion of evidence of physical and psychological circumstances of defendant's confession deprived petitioner of fair trial); *Green v. Georgia*, 442 U.S. 95 (1979) (per curiam) (application of hearsay rule violated due process even though correct as a matter of Georgia law).

*Chambers*, in short, establishes a rule that binds state and federal courts alike. It ensures the fundamental fairness of a defendant's trial. Its message is especially strong in our case, which, like *Chambers* itself, concerns a defendant's right to demonstrate his innocence on capital charges. Just as in *Chambers*, in Kubsch's case even though the videotaped evidence of Mandy's interview was technically hearsay (the very same rule of evidence at issue in both *Chambers* and *Green*), it was created in a way that provided substantial assurances of its accuracy. It missed qualifying for the "recorded recollection" exception to the hearsay rule by a hair. It included numerous details that were either undisputed (*e.g.,* Mandy was a friend of Aaron's; she lived across the street from him; they went to the same school) or easily subject to corroboration. As I now show, these are precisely the circumstances in which the Court has found that the evidentiary rule must give way to the defendant's due process right to a fair trial.

**IV**

**A**

I begin with what may be the strongest reason for admitting the Mandy videotape: its quality as a *de facto* recorded recollection. (I say "*de facto*" out of respect for the Indiana Supreme Court's ruling that it fell short, not because I would necessarily have come to the same conclusion.) As I noted earlier, at the time of Kubsch's second trial, Indiana Rule of Evidence 803(5) read as follows:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: … (5) Recorded Recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly.

This rule, along with Indiana's other rules of evidence, had been adopted in 1994. It was intended to codify the common-law exception to the prohibition against the use of hearsay evidence for records of past statements about which the witness has no present memory. By requiring only "insufficient" recollection, the rule as adopted relaxed Indiana's common-law doctrine, which had required the complete absence of any memory as a condition of admissibility. INDIANA PROPOSED RULES OF EVIDENCE 75 (1993); see also FED. R. EVID. 803(5) Committee Note (the model for the Indi-

ana rule), (discussing "[t]he guarantee of trustworthiness …
found in the reliability inherent in a record made while
events were still fresh in mind and accurately reflecting
them"). The key is that the circumstances surrounding the
preparation of the record make it particularly reliable.
INDIANA PROPOSED RULES OF EVIDENCE 75. The rule itself
does not specify how the accuracy of the recorded version
should be proved. The Indiana Supreme Court in *Kubsch II*,
however, took the position that the witness must somehow
vouch for its accuracy. See also 2 MCCORMICK ON EVIDENCE
§ 283 (7th ed. 2013). That can be difficult, since by definition
the witness does not recall making the statement, but com-
mon practice, conformity with other things the witness
knows, or even a statement such as "I would not have lied
about that" typically satisfy the vouching requirement. See
generally 30C MICHAEL H. GRAHAM, FEDERAL PRACTICE AND
PROCEDURE § 7046 at 115–16 & n.4 (interim ed. 2011).

In applying Rule 803(5), Indiana courts both before and
after the various *Kubsch* opinions have looked to see if the
recorded recollection (1) relates to a matter about which the
witness once had knowledge; (2) is one about which the wit-
ness now has insufficient recollection to permit her to testify
fully and accurately at trial; (3) is one that the witness is
nonetheless willing and able to adopt or vouch for; (4) is one
made when the matter was fresh on her mind; and (5) cor-
rectly reflects the witness's knowledge at the time of the
event. *E.g.*, *Impson v. State*, 721 N.E.2d 1275, 1282–83 (Ind. Ct.
App. 2000). The final requirement is inevitably awkward,
because there is tension between the ability to vouch and the
inability to recall. But Indiana courts have resolved that ten-
sion by adopting a realistic approach to vouching; they have
accepted even a simple statement that the report is accurate.

*E.g.*, *A.R.M. v. State*, 968 N.E.2d 820, 827 n.7 (Ind. Ct. App. 2012); see also *Gee v. State*, 389 N.E.2d 303, 309 (Ind. 1979) ("At the time of his testimony he may have completely forgotten the event … but at that time he can vouch for the accuracy of the prior writing."). In one case, the court was satisfied when a witness testified that she "told the truth in her videotaped statement." *Horton v. State*, 936 N.E.2d 1277, 1283 (Ind. Ct. App. 2010), *vacated on other grounds*, 949 N.E.2d 346 (Ind. 2011). And at times, the courts have simply assumed that the report in question accurately reflects the witness's knowledge at the time of the report. See, *e.g.*, *Small v. State*, 736 N.E.2d 742, 745 (Ind. 2000) (permitting admission of deposition answers because witness could not recall making specific statements in the deposition, but failing to address whether witness affirmed that she was truthful at the time of the deposition); *Smith v. State*, 719 N.E.2d 1289, 1291 (Ind. Ct. App. 1999) (stating only that "the report reflected [the witness]'s knowledge correctly" without explaining why).

It is easy to see why an endorsement from the witness would be important for many types of recorded recollection, such as diaries, letters, written reports, memoranda, or data compilations. A witness might be able to authenticate her signature, or her habit of writing every evening in a diary, or her acquaintance with the purpose and recipient of a memorandum, without necessarily remembering what was said as a matter of substance. And this kind of vouching serves an important purpose for those kinds of records, because there is nothing otherwise to ensure that it is *this* witness's recollections that were recorded.

I recognize, however, that it is not up to this court to decide whether the Supreme Court of Indiana correctly inter-

preted its own rule of evidence. This is so even though that court barely touched on the reason why the videotape was inadmissible. Here is the entirety of its explanation for the conclusion that the final element of Indiana's Rule 803(5) was not satisfied:

> Buck testified twice that she had no memory of being interviewed by the police in 1998. (Trial Tr. at 2985.) As a result, the trial court correctly denied Kubsch the opportunity to read Buck's statement into evidence, because Buck could not vouch for the accuracy of a recording that she could not even remember making.

*Kubsch II*, 866 N.E.2d at 734–35. This merely describes the fact that this was a matter "about which [the] witness once had knowledge but now has insufficient recollection" to permit full and accurate testimony. Indiana made clear at the time it adopted Rule 803(5) that "insufficient" recollection includes no recollection at all. There is thus no reason to think that the total absence of recollection precludes the use of the rule.

The Indiana Supreme Court did not express any doubt that the other requirements of Rule 803(5) were satisfied. For purposes of *Chambers*, then, we have a situation in which the state hearsay rule was used to block critical evidence. There were, however, just as in *Chambers*, substantial assurances of reliability of this evidence, which I discuss below. This was therefore a situation in which the due process command expressed in *Chambers* should have overridden the state's evidentiary rule.

B

Putting *Chambers* temporarily to one side, the fact that the showing at trial was inadequate to satisfy the letter of Rule 803(5) takes us to one of Kubsch's other theories: that he received ineffective assistance of trial counsel in a number of respects, including "in their attempt to admit Amanda Buck's videotaped statement."[1] Counsel failed to take any of a number of readily available steps to meet the requirements of Rule 803(5)—steps that were necessary, under *Wiggins v. Smith*, for effective assistance of counsel. Indiana courts require that the witness whose recollection has faded need only tell the finder of fact that her statements in the recording were accurate. Kubsch's attorneys never asked Mandy that question. Instead, they dropped the subject after establishing

---

[1] My colleagues attempt to rehabilitate Kubsch's lawyers in this respect, but they are forced to resort to speculation about what a proper investigation would have revealed. As the Supreme Court has made clear, however, it is essential to evaluate the question whether counsel's investigation was constitutionally sufficient. See *Wiggins v. Smith*, 539 U.S. 510 (2003). There the Court faced a case in which the petitioner's claim "stem[med] from counsel's decision to limit the scope of their investigation into potential mitigating evidence." *Id.* at 521. Quoting from *Strickland,* the Court reaffirmed that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* In addition, the Court squarely recognized that it is not enough to gather "*some*" information. *Id.* at 527. In language that applies with equal force to Kubsch's case, it held that "[i]n assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* Just so. Kubsch's lawyers knew about Mandy's videotaped statement, but that evidence would have led a reasonable attorney to investigate further. Their failure to take that step amounted to constitutionally ineffective assistance.

the fact that she could not recall speaking to the police, which relates to a different requirement of the rule (one that was easily met). They should have asked her whether she would have told the police the truth if such an interview had taken place, but they did not. They could have shown her the beginning of the videotape on the record—the trial transcript indicates they showed Mandy the tape off the record but never put her back on the stand afterward—and asked her whether she was the girl depicted in the recording. They could have asked Monica or anyone else who knew Mandy well about her reputation for truthfulness. Any of these steps, and certainly all of them taken together, would have met the requirements Indiana courts have set for compliance with Rule 803(5)'s requirement for evidence that shows that the recording reflects the witness's knowledge correctly.

Counsel also could have taken steps to counteract the trial court's assumption that it would have been so easy to impeach Mandy's videotaped account that any error in refusing to allow it as a prior inconsistent statement would have been harmless. The state urged that this was the case based on the telephone call from Mandy's grandfather, Lonnie, a few days after the interview urging the police to disregard her statements because she was supposedly mistaken about the day she was talking about. According to Lonnie, everything Mandy recounted had happened on Thursday, September 17, not on Friday the 18th. But there is no reason to conclude, without any adversarial testing, that Lonnie was correct. No evidence at all indicates how reliable his source of information for that statement may have been. He may have been trying to extricate his granddaughter from involvement in the murder trial, or he may have had some other motive that no one ever explored.

Had counsel for Kubsch been on their toes and complied with their duty to investigate in conformity with *Wiggins*, there are many ways in which they could have rehabilitated Mandy's very clear testimony (see Appendix B) that she was recalling the events of *Friday*, just four days earlier than the interview. Anyone who watches the video can only be impressed by how articulate, bright, and forthcoming Mandy is in it. If there were some concern about the fact that Mandy was nine years old at the time, counsel could have put Mandy's mother, Monica, on the stand and asked on what day of the week she was paid and whether she possibly could have been depositing her paycheck on a Thursday. Records from Monica's bank could have been subpoenaed to see when that deposit was made, and additional evidence such as security camera footage could have shown the day on which she was there. The school district could have been subpoenaed for records confirming on what day the field trip that Mandy discussed in detail actually took place. Kubsch's counsel did none of these things.

My colleagues dismiss the video as unreliable, but saying so does not make it so. In fact, many factors support the reliability of this video, both for purposes of substantive evidence and for purposes of impeachment:

- It was created only four days after the events about which both Mandy and Monica were speaking.

- Because the method of recording the recollection was video, rather than audio or writing, there was no chance that the identity of the speakers nor the content of their statements could be mistaken.

- Mandy provides an elaborate timeline and describes small details from her direct observations of the victims at their home.

- Mandy's mother, Monica, was present throughout the interview and provided corroborating details at numerous points.

- Neither Mandy nor Monica had any personal interest in the case; there was thus no reason to fear that their accounts were slanted one way or the other.

- Both Mandy and Monica were available at trial to testify after the video was shown, at which point the jury would have been able to weigh their live statements at trial against their recorded statements on the video.

The failure to take steps that would have allowed the videotape to be admitted for all purposes pursuant to Indiana Rule 803(5), and that would also have permitted its use to impeach Mandy's statement at trial that she "probably didn't see" Aaron that afternoon, amounted to insufficient performance for purposes of *Strickland v. Washington*, 466 U.S. 668 (1984). It also severely prejudiced Kubsch. Mandy's videotaped testimony, if believed, would have shown that the murders of at least Rick and Aaron, and probably Beth (on the theory that Rick and Aaron interrupted the assault on Beth), took place at a time when Kubsch was already in or on his way to Michigan to pick up Jonathan. This was easily Kubsch's strongest defense to the charges, and it was

swept away by a combination of the trial court's evidentiary rulings and counsel's ineffectiveness.

## C

The majority argues that despite the inherently credible nature of the video and Mandy's statements on it, there were three other primary reasons for concluding that it was not reliable enough to meet the *Chambers* standard for use at trial: first, that Mandy's statements were not corroborated; second, that she was "essentially unavailable" for cross-examination; and third, that Detective Reihl "never pushed" Mandy on "critical details" during the 1998 interview, such as whether she had her dates and times correct. *Ante* at 27–30. I begin with the last contention. A review of the transcript at Appendix B shows that this is simply not the case. The majority posits that Reihl "was simply taking [Mandy's] account as she spoke," but Reihl repeatedly stops and "pushes" Mandy to confirm what she is saying. He asks her over and over whether she is talking about Friday's events. (*E.g.,* "[D]o you remember last Friday?" "And did they pick you up Friday?" "Was that white truck at Rick's house Friday?" "Friday, after you got home, they left just a little bit after when you got home, right?") At the end of the interview, Reihl turns to her mother, Monica, and asks again for assurance: "[t]hese times that you've given me today, uh, these are pretty accurate?" Monica responds that they were, "pretty well," because "sometimes I have to stay a couple minutes after, so, I get home a little later. And that was just so happen [*sic*] to have been one of the days that was a little bit later." It is also clear from the transcript that this was not the first time Monica and Mandy had spoken to Reihl about that past Friday's events. At various points, Reihl indicates

that he was following up on a conversation they had previously "at the house." Given these repeated assurances, there was little reason for Reihl a day later to ask the two interviewees yet again "about the possibility that her memory had confused events of two different days," as the majority suggests is necessary to meet the requirements of *Chambers*. *Ante* at 42. For all we know, Reihl did not like what he was hearing and was hoping that they would change their story.

The majority also understates the degree of corroboration for Mandy's account in the videotape (as I have said, corroboration that is just as good as that found in *Chambers* itself). Mandy's own mother interjects corroborating remarks repeatedly during the interview. My colleagues push this to one side because they believe that Monica's subsequent off-the-record, non-testimonial statement to police that she (but not Mandy) had the wrong day effectively erased Monica's own consistent corroboration in the video. The transcript provides no support for this interpretation. To the contrary, Monica is an active participant who provides her own detailed account of her afternoon on that Friday. Like Mandy, Monica herself saw Aaron after school, even though she did not see Rick. (No one thinks that Aaron and Rick took separate cars to the Kubsch house; Aaron was far too young to drive.) And, as I already have pointed out, there was much more corroboration easily within reach.

Last, some precision is necessary with respect to Mandy's availability for cross-examination. She was not "unavailable" in the sense of not being present at trial. She was in the courtroom and she testified; at least one aspect of her testimony, as the Indiana Supreme Court acknowledged, should have been impeached by her statements on the video. She

was "unavailable" only because her memory had failed. But that is true of every witness proffered under Rule 803(5). Indiana courts, like others, look for the next-best assurances. Mandy never claimed that she was not the girl on the tape, nor has the state ever argued that the "Monica" on the tape was not Mandy's mother. There was, in short, ample corroboration even on the record that exists to satisfy this aspect of the *Chambers* rule. The majority sees no way to distinguish this hearsay from the ordinary mine-run of hearsay, and it accuses me of throwing the door open to admission of every recorded police interview. Not so. In many cases, the witness will have a good enough recollection of what happened that Rule 803(5) will never come into play. In many cases, the proffered hearsay will be cumulative or relevant only to a peripheral matter. In the great majority of cases, the admission of the hearsay statement will not have life-or-death consequences. The dissent in *Chambers* worried about exactly the same things the majority here invokes. But the dissent did not prevail, and the Supreme Court has continued to follow *Chambers* in the small group of cases to which it applies. This court should not be second-guessing the Supreme Court, but I fear that is what the majority has done. Under its view, *Chambers* will never apply to allow a defendant to introduce pivotal evidence, if a state rule would block it. By so ruling, it is contravening the Supreme Court's command that "the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302.

In fact, this case is as close to *Chambers* as anyone is likely to find. My colleagues misapply the Supreme Court's guidance in *Williams v. Taylor*, 529 U.S. 362 (2000) (O'Connor, J.), when they insist on a precise factual match between *Chambers* and the present case. The Court has never insisted on

factual identity between its earlier case and the new one. See *id.* at 407 ("[A] state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or *unreasonably refuses to extend that principle to a new context where it should apply*.") (emphasis added). Kubsch's situation, while differing in some details from Chambers's, is close enough to require application of the same principle.

The majority fears that if *Chambers* requires admission of the videotape, then state hearsay rules are out the window. But their gripe is with the Supreme Court, not with me. I have shown why and how the facts cabin this case. In very few matters before the court will the price of insisting on exclusion of evidence that does not fit every technical requirement of the state's hearsay rule be death. That alone should lay to rest any fears that granting Kubsch relief under *Chambers* will produce the "sweeping" result the majority fears. Like defendant Chambers, Kubsch was "thwarted in his attempt to present this portion of his defense by the strict application of certain [state] rules of evidence." *Chambers*, 410 U.S. at 289. In Kubsch's case, the hearsay problem was compounded by the ineffectiveness of counsel's efforts to get the tape admitted.

In *Chambers* (also a murder trial), the application of the state's rules on vouching for witnesses *and hearsay* prevented the defendant from calling as an adverse witness the person who he said was the real murderer and three witnesses who would have supported that proposition. The state excluded that evidence notwithstanding the fact that it was created "under circumstances that provided considerable assurance

of [its] reliability." *Id.* at 300. Those circumstances included the fact that the confessions of the apparent murderer to which each excluded witness was prepared to testify were "made spontaneously to a close acquaintance shortly after the murder had occurred"; each was corroborated by other evidence in the case; and each was self-incriminatory and against the speaker's interest. *Id.* at 300–01. The alleged true murderer "stood to benefit nothing by disclosing his role in the shooting," and he was in the courtroom during the trial and so could have been cross-examined by the state and evaluated by the jury. *Id.* at 301.

Mandy and Monica Buck were not potential suspects in this case, but their videotaped statements bore equally compelling indicia of reliability. The majority downplays these facts, but they overlook the significant ways in which the Supreme Court itself has confined *Chambers*. Granting the writ to Kubsch under *Chambers* would not abolish the rule against hearsay, any more than *Chambers* abolished hearsay and vouching, the two rules at issue there. A set of very particular circumstances must arise to produce a case like Kubsch's, or like that in *Chambers*. As I already have pointed out, a result in Kubsch's favor would not lead to the admissibility as substantive evidence of "all hearsay of this type [videotapes?]," to use the majority's words, *ante* at 45.

In this case, the operation of Indiana's hearsay rule, coupled with counsel's inadequate efforts with regard to the tape, prevented Kubsch from showing that he could not have been the murderer. Like Chambers, Kubsch also tried to show that someone else was the guilty party—in Kubsch's case, his sometime friend Brad Hardy. There appears to have been significant evidence pointing to Hardy. Indeed, at one

point the state had charged him with conspiring with Kubsch to commit the murders and with assisting a criminal (Kubsch). *Kubsch II*, 866 N.E.2d at 731. Hardy wound up testifying against Kubsch in the first trial; interestingly, the state did not drop the charges against him until two years later.[2] The excluded videotaped evidence in Kubsch's case had even greater guarantees of reliability than the evidence before the Supreme Court in *Chambers*. And the exclusion of the videotape drastically undermined Kubsch's ability to demonstrate that someone else must have committed the three murders. The *Chambers* exception exists for just this kind of case. In my view, the Indiana courts' refusal to recognize and apply it amounts to constitutional error that must be recognized, even under the demanding standards of 28 U.S.C. § 2254(d)(1).

## V

Wayne Kubsch may be a disagreeable man, as Mandy said in her videotaped statement. His business skills may have been bad, and he may, as of September 1998, been flailing around for a way to solve his financial problems. And a jury with all of the evidence before it may have convicted him for the murders of Beth, Rick, and Aaron, if it had been persuaded that Mandy's videotaped testimony was not worthy of belief for some reason. But a jury with all of the evidence before it may also have concluded that Kubsch, no matter what his other flaws, could not have committed those

---

[2] As my colleagues point out, Hardy testified against Kubsch in the second trial. By that time they were surely adverse to one another; indeed, it would not be surprising if Hardy's charges were dropped in exchange for that testimony.

murders because Rick and Aaron, and perhaps Beth, were still alive at 3:45 p.m., when Kubsch was already far from the house driving to Michigan. We will never know, because my colleagues are unwilling to find either the disregard or incorrect application of *Chambers* here, nor do they perceive ineffective assistance of counsel. I cannot subscribe to that result. I therefore respectfully dissent from the decision to affirm the district court's denial of the writ and the consequent green light for Kubsch's execution.

APPENDIX A

Timeline of events, September 18, 1998

| Time | Kubsch | Beth/Others |
| --- | --- | --- |
| 6:00 am | Near Mishawaka home (cell record). | Beth is at work in Elkhart (United Musical Instruments). |
| 6:50 am | At work in Elkhart (Skyline Corp.). | |
| 9:11 am | Cellphone call near work. | |
| 10:00 am | | Beth finishes shift and goes home. |
| 10:30 am | | Beth pages Kubsch twice from home. |
| 10:45 am | Call to Beth from Skyline break room. | |
| 10:48 am | | Beth makes a call from home to Rick's house. |
| ~10:53 am | | Beth goes out to run errands. |
| 11:08 am | | Security camera at Teacher's Credit Union shows Beth with the dog in the car. |
| 11:13 am | Kubsch punches out of work. | |

| Time | Kubsch | Beth/Rick |
|---|---|---|
| 11:14 am | | Beth's credit union receipt shows transaction completed. |
| 11:30 am to noon | Kubsch at home (seen by Erin Honold). | |
| 11:37 am | Call from home to American General Finance. | |
| 11:52 am | | Beth meets with credit counselor Edith Pipke in South Bend. |
| 12:09 to 12:11 pm | Kubsch makes 1 call to house and 2 calls to Rick (cellphone). | |
| 12:16 pm | | Beth pages Kubsch again. |
| 12:18 pm | Kubsch calls the house (31 seconds) from Osceola (toward Elkhart). | |
| 12:40 pm | Kubsch calls house from break room at Skyline. | |
| 12:46 pm | | Rick calls Beth at home. |
| 1:17 pm | Kubsch calls house from break room at Skyline. | |
| 1:52 pm | Kubsch punches out again and does not re- | |

| | | |
|---|---|---|
| | turn. | |
| 1:53 pm | Kubsch calls home from Elkhart area (46 seconds). | |
| 2:20 to 2:35 pm | | Rick picks up Aaron from school in South Bend. |
| 2:51 pm | Kubsch makes call from near home (cell records). | |
| 3:15 pm | Kubsch calls Beth's mother from Elkhart (after 10 tries). Cell sectors indicate he is heading toward Michigan. | |
| 3:45 to 4:15 pm | | Approximate time when Mandy saw both Aaron and Rick at their South Bend home. |
| 4:42 to 4:47 pm | Kubsch makes calls near Schoolcraft, MI. | |
| 5:00 pm | Kubsch picks up son Jonathan in Three Rivers, MI. | |
| 5:30 to 5:45 pm | Kubsch sees Wayne Temple at Kmart in Three Rivers. | |

| 5:30 to 6:30 pm | Kubsch and Jonathan stop in Osceola at home of Constance Hardy. | |
|---|---|---|
| 5:30 pm | | Anthony discovers the bodies of Rick and Aaron Milewski at the house. |
| 5:56 pm | Kubsch makes phone call on network close to the house. | |
| 6:45 pm | Kubsch returns home; police are there; he goes to station for first interview. | |
| 9:00 pm | | Police discover Beth's body in basement; they bring Kubsch back to the station. |
| After 9:00 pm | Kubsch interviewed second time by police; he invokes *Miranda* rights. | |

APPENDIX B

Transcript of Police Interview with Monica and Mandy Buck
September 22, 1998

Det. Mark Reihl: [Inaudible] stepped out for a minute. I'll go ahead and start asking you a couple questions. Okay, and the time is now three o'clock PM. And, today is September the twenty-second, nineteen ninety-nine—nineteen ninety-eight. And Mandy, is it M-a-n-d-y?

Mandy: Uh huh.

Reihl: M-a-n-d-y. Buck. B-u-c-k?

Mandy: Uh huh.

Reihl: And you're how old?

Mandy: Nine.

Reihl: Your birthdate is?

Mandy: Ninety-eight. Nineteen ninety-eight. Oh, nineteen eighty-nine.

Reihl: This is nineteen ninety-eight.

Mandy: Nineteen eighty-nine.

Reihl: What month were you born?

Mandy: February.

Reihl: February. What day?

Mandy: Eighth.

Reihl: Nineteen eighty-nine.

Mandy: Yeah.

Reihl: Alright.

Mandy: But you can ask my mommy on that. I think so.

Reihl: Oh, I'm pretty sure, all right? You're pretty intelligent. I think you know.

Mandy: Yeah, I think that, yeah yeah yeah.

Reihl: Mandy was born February the eighth?

Monica: Yeah.

Reihl: Nineteen eighty-nine?

Monica: Mmm hmm.

Reihl: Okay.

Mandy: Cool, I got it right.

Reihl: See, you got it right. Okay. And your mother's name is Monica?

Mandy: Uh huh.

Reihl: M-o-n-i-c-a? Correct me?

Monica: Yeah.

Reihl: Buck. And you live at thirteen twenty East Indiana in South Bend.

Mandy: Uh huh.

Reihl: And your home phone is two three three, seven seven three seven?

Mandy: Two three three seven seven three seven. Yep.

Reihl: Right. And you go to Lincoln School?

Mandy: Yeah.

Reihl: And you're in which grade? Fourth?

Mandy: Yeah.

Reihl: Okay. How's school this year?

Mandy: Umm, good, even though I have the teacher that, um, is the Wicked Witch of the West, she's fine. She's okay.

Reihl: Well sometimes they gotta be like that so you kids will listen.

Mandy: Yeah.

Reihl: Okay. Well, the reason you're here is that you live right across the street—

Mandy: From Aaron?

Reihl: From Aaron and his dad Rick.

Mandy: Yeah.

Reihl: Okay. And you and Aaron were pretty good friends, huh?

Mandy: Best friends, yeah.

Reihl: Best friends?

Mandy: [Nods head]

Reihl: How long have you known Aaron?

Mandy: I don't know. I think he moved there in like the beginning of May I think. Just beginning. I don't know. I never kept track of it. I don't know. 'Cause he told me one day and then I just forgot.

Reihl: Oh, that's okay.

Mandy: I can't remember I think—

Reihl: Time just goes by so fast, doesn't it? And you said that Aaron used to talk sometimes about things that made him sad?

Mandy: Mmm hmm. [Nods head]

Reihl: Made him upset?

Mandy: Right, and like he, he he wished his mom didn't break up with his dad and like go with Wayne. He was like, he didn't like Wayne.

Reihl: Aaron didn't like Wayne?

Mandy: No.

Reihl: Well how come?

Mandy: Um because, like, he would get rough with him and stuff and punch him too hard and stuff like that.

Reihl: Was it because—did he ever say was it because Wayne was mad at him or were they just playing?

Mandy: He never said, he never said why he didn't like him he just said like, he just said he just didn't like him because Wayne was just like too rough and stuff.

Reihl: Okay. Did he ever say if Wayne ever was rough with his mom?

Mandy: No.

Reihl: You didn't talk about that?

Mandy: No.

Reihl: Okay. What else did you guys talk about?

Mandy: Um, we talked about like, why he moved here and like what we wanted to be when we got older and, um, who

are our friends and where we used to live and, like, and I introduced him to my parents; he introduced me to his dad. Then we just became best friends.

Reihl: That's great.

Mandy: I always went over to his house. He always came over to my house and like we like used to study for the same spelling words. He'd give me my spelling words and I would give him his spelling words. And we would help each other on homework and stuff. We were pretty good friends.

Reihl: That's, that's wonderful.

Mandy: We got along really good.

Reihl: He's a pretty good kid, huh?

Mandy: Mmm hmm. [Nods head]

Reihl: Smart?

Mandy: Uh huh. [Nods head] He knew, he knew his times pretty good. He could, he could just do 'em in a flash. He was pretty good at 'em. He's a lot better than me.

Reihl: Did you, did you say you used to walk to school with him sometimes?

Mandy: Uh no, I never walked.

Reihl: Oh, you never did.

Mandy: No. I see—I seen him walk to school.

Reihl: Uh-huh.

Mandy: I never walked to—I never walked to school or to my house alone.

Reihl: Okay, and how would he get home?

Mandy: Um, usually some, if he wasn't grounded from his bike would ride his bike home. He would walk home. His dad would come and pick him up when he had his truck. Um, Rick would walk to school and pick up Aaron. They would walk back home together.

Reihl: Mmm hmm. And, and you guys get out of school at what time?

Mandy: Two twenty.

Reihl: Two twenty. And how long does it take him to get home do you think?

Mandy: Mmm probably like—we don't live too far from Lincoln. All you gotta do is go straight and turn and you're there.

Reihl: Oh.

Mandy: Probably like five minutes to get there.

Reihl: Uh-huh. Okay.

Mandy: If he was riding his bike it would only take him like two minutes. But if he was walking it would probably take him a pretty long time.

Reihl: Mmm hmm. Now, do you remember last Friday?

Mandy: Yeah.

Reihl: Okay. And you told me earlier that you go to the Alphabet Academy?

Mandy: Uh huh. [Nods head]

Reihl: And that they usually pick you up at school, right?

Mandy: Uh huh. [Nods head]

Reihl: Okay. And did they pick you up Friday?

Mandy: Uh huh. [Nods head]

Reihl: And you went straight to the Alphabet Academy?

Mandy: Uh huh. [Nods head]

Reihl: And say then you what, your mom picks you up from there?

Mandy: Uh huh. [Nods head]

Reihl: Okay. And you said you picked her up about what time?

Monica: Between three thirty and quarter to four.

Reihl: Okay. And you went straight home? Or where'd you go?

Monica: I usually call down there and I watch her walk from there down to our house. And then I waited for my mom and dad to get home, and I went and cashed my check and came home.

Reihl: Okay, when you got home at three thirty, um, did you notice if Rick was at home across the street?

Monica: I didn't pay no attention. All I saw was Aaron.

Reihl: You saw Aaron?

Monica: Mmm hmm.

Reihl: You don't remember if Rick's truck was there?

Monica: No.

Reihl: Okay. And, then Mandy you were telling me that when you got home that was about what time?

Monica: From day care?

Reihl: Yeah.

Monica: That was around three thirty, quarter to four.

Reihl: Okay, and that's when you saw Aaron?

Mandy: Uh huh. [Nods head]

Reihl: And you saw his dad?

Mandy: Uh huh. [Nods head] His dad, he, his dad was coming from their living room into the kitchen to get something to drink.

Reihl: Did you go over to Aaron's house or you just saw him from your house?

Mandy: I, I, um, when I walked, when I, every day when I walk home I always see Rick walk into the kitchen or walk into the restroom or walk into his room.

Reihl: I mean, did you see him from outside looking in or did you actually go into the house?

Mandy: No, I um seen it from the outside 'cause when 'cause I seen him go into the kitchen. When he came back he had a drink in his—he had, um, some um—I don't know what it was. He had a drink in his hand but it was in a cup.

Reihl: Okay.

Mandy: Like usually pop, 'cause they like, they like Storm a lot. So, probably Storm.

Reihl: What, uh, what does Rick drive?

Mandy: A Chevy? He used to drive a Chevy until it broke down.

Reihl: A Chevy what?

Mandy: [Eyes searching, no verbal response]

Reihl: Is it a car or a truck?

Mandy: Truck.

Reihl: What color?

Mandy: Black.

Reihl: Okay.

Mandy: It's like, kinda short. I mean like it—did you see my mom's truck? Um, well, uh my mom's truck, my mom's truck's pretty big. His is probably a medium truck, you know. Kinda short.

Reihl: What was he driving Friday? Did you see that?

Mandy: Um, his truck broke down before that. He was drive—driving a white truck which was his brother's. And his brother had a car so his brother let Rick use the truck.

Reihl: Okay. Was that white truck at Rick's house Friday?

Mandy: Yeah.

Reihl: When you got home from school?

Mandy: Yeah.

Reihl: Okay. And this is about what time again?

Monica: Three thirty, quarter to four.

Reihl: Okay, so between three thirty and quarter to four—

Mandy: Yeah.

Reihl: You saw—

Mandy: Aaron and Rick.

Reihl: Okay, at the house. Did you ever see 'em leave?

Mandy: Um, yeah, like I was on my porch and, and they let me blow bubbles. And I was blowin' my bubbles, and I seen Rick pull out and leave.

Reihl: Okay. Now how long, how long after—and this might be hard to guess at—'cause you probably don't wear a watch, do you?

Mandy: Well, until my watch, well, yeah I did but my watch is in my bag and I—'cause I had to take it off when we had gym. I just take it off.

Reihl: So, about what time do you think they left their house, if you had to guess?

Mandy: Um—

Reihl: I know it's gotta be a hard question.

Mandy: Um—

Reihl: Was it very long after you got home?

Mandy: Mmm, medium. Because his mom lives pretty far away, you know. And you know but I think it was like—I don't know.

Reihl: Okay.

Mandy: It was probably in like medium because you know it takes a pretty long time to get to his mom's house.

Reihl: Well why was he going to his mom's house. I think he told you, didn't he?

Mandy: Um, I guess to just visit her.

Reihl: Okay, did he talk about going to his mom's house?

Mandy: He said that he was going to his mom's house Friday, 'cause he was gonna stay the night there to go to the field trip Saturday. So it was probably why, and Rick probably wanted to stay a little while to talk. You know, he was, he—he wanted to go on the field trip bad. So, they were gonna leave pretty early to get to the school on time to go. But by the time Saturday when we, when we were on the bus and stuff, he was gonna be in our group, and, um, he never showed up. He wasn't there. And we didn't know why. But Saturday—Sunday when we got home with my cousins, um, 'cause we go camp—we went camping after the field trip, we just went, we came back from the field trip, and my mom drove her truck back to the, back up to our house and up to the camper and, and my grandma goes, "Did you see Aaron?" and I'm like, "No, he was supposed to be in our group, he wasn't there." And then Sunday, um, my um, my day care teacher said they showed it on TV but my grandpa didn't get, my grandpa didn't turn it on there because he, he didn't know it was they got murdered Friday night. So, I mean, and then Monday, um, Monday, Monday News Center 16 came to my house, and I was at karate 'cause I, I had practice. When we came home my grandma said News Center 16 just, just came to our house like, probably a while ago.

Reihl: So you didn't get a chance to talk to him then, huh?

Mandy: No.

Reihl: So, Friday, after you got home, they left just a little bit after when you got home, right?

Mandy: Yeah.

Reihl: And you saw 'em leave?

Mandy: Yeah. He pulled out.

Reihl: And they were just together, Rick and Aaron, nobody else with 'em?

Mandy: No one else was with them, just Aaron and Rick.

Reihl: Okay.

Mandy: 'Cause Rick, 'cause Aaron's mom—He didn't know if Aaron's mom was home yet so Rick was thinking if his mom's not there, then Wayne's probably not there. So, he said, "I'll just drive you," and they just took off, pulled out and took off.

Reihl: Okay.

Mandy: And—

Reihl: Monica, Monica, I'm sorry.

Mandy: And Fri— and Thur—and when I was playing with them—

Reihl: Mmm hmm.

Mandy: There was, he had some clothes laying on his, laying on his on their swing on the front porch. Um, he had a whole bunch of clothes laying on there and I, I didn't know what they were for. You know, I thought he was gonna spend the night there Saturday and Sunday, come home Monday. Um, Sunday's rolling around and he wasn't there. Saturday, Saturday the field trip, he wasn't there.

Reihl: Monica, you said something back at your house when I was talking to you about um, you said you'd cashed your check.

Monica: Yeah.

Reihl: Friday?

Monica: Yeah.

Reihl: And that was about what time? Was that after you come home from work?

Monica: Shortly after I came home from work.

Reihl: Okay. And, what time do you think that was?

Monica: Let's see. Probably about ten minutes till four.

Reihl: Okay. So then you got home then about—how long were you gone to cash the check?

Monica: Probably about fifteen minutes.

Reihl: Okay, and when you got home, that would have put it a little after four o'clock? And was Rick still at the house then?

Monica: I didn't pay no attention. Like I said, all I saw was Aaron. I really didn't look to see if Rick's truck was there.

Reihl: Well, Aaron was still there when you got back after you cashed your check?

Monica: Yeah.

Reihl: Okay. And you don't remember if that truck was in the—

Monica: Nuh uh, I didn't pay no attention.

Reihl: Okay, um—You said something, too, didn't you about you overheard something one time a couple months ago.

Monica: Yeah. I don't, like I said, I don't know who the woman was. But he was standing, they were standing in their driveway. And, well he was standing in the driveway.

She was sitting in the truck. And, uh, I couldn't hear what she was saying, but he was, you know, he was saying the F-word, and F him, he don't scare me, and he was just going on and on and on. And then he, then she left, and he just went into the house.

Reihl: This truck, what did it look like?

Monica: It was a, it was a little black truck.

Reihl: Do you know, do you know your vehicles? Do you know the difference between a—

Monica: Well, the lettering on the back was kinda, on the back of it was kinda like, rusted like, and you couldn't really tell what kind of car it was—

Mandy: Um—

Monica: —what kind of truck.

Mandy: Aaron's dad's truck had Chevy right there. It was just printed beautifully. It was gold and it was just right on there. You could just read it, so it couldn't have been Aaron, Aaron's dad's truck, 'cause Aaron's dad's truck was, but, it was still there where he, it broke down. I mean Aaron's truck's, dad's truck was just beautiful. The Chevy was just—

Reihl: But was this was this his ex-wife? Was this—

Monica: I don't know.

Reihl: —Elizabeth?

Monica: I don't know who she was. Like I said, all I saw, all I, I never seen the woman. You know, I, I just know that she had blonde hair. Well, I seen her face, but she had blonde hair.

Reihl: Was she a passenger in the truck?

Monica: No. She was driving it.

Reihl: Okay.

Monica: And this was, then I saw her once a little while after that. You know, like a, I don't know, a couple weeks later. And that was the last time I seen her.

Reihl: What was she driving then?

Monica: Same thing.

Reihl: This truck?

Monica: Mmm hmm. I don't know, I don't, like I said I don't know who she was.

Mandy: Aaron's mom's, mom has um, blonde hair.

Reihl: Mmm hmm. I was just trying to see if maybe you could describe this truck. Was there anything, was it, was it a pickup truck where it has the open bed in the back or was it all closed up?

Monica: Uh, let me think. I think it was open. See, 'cause the one that that, ah, Aaron's dad used to drive had the little things that went down the side.

Reihl: Mmm hmm.

Monica: But it wasn't all closed in. It just had like little, I don't know what you'd call 'em, it went from the top all the way to the back of the truck, and it was just a short thing. This one was all open, I believe. I think it was.

Reihl: It was just like a regular pickup truck.

Monica: Yeah.

Reihl: Okay. So it wasn't like a little sport utility vehicle?

Monica: No.

Reihl: Like you see like one of those Suzuki Samurais or something like that?

Monica: No. It was—

Reihl: Kids drive a lot.

Monica: It was pretty rusted.

Reihl: Okay. All right. But you don't know whether or not that was his—

Monica: No I have no idea.

Reihl: His ex-wife Elizabeth or not? All right.

Monica: I just know that he was highly upset that day.

Reihl: Oh.

Monica: And she didn't look too happy, and she left and he went into the house.

Reihl: Okay.

Monica: Yeah, I don't even, I don't know who his ex-wife is. I mean, it could have been her, but I, I don't know.

Reihl: Okay. Was there anything else? I can't remember exactly what all we talked about at the house but, did you say that, uh, I was thinking that you said that Aaron had made some comments to you before, too, about—

Monica: Oh, he just told me the once.

Reihl: Oh.

Monica: He just told me one time that he doesn't like his stepdad. But, I just figured he was just being a kid.

Reihl: Yeah.

Monica: You know, "My mom and dad's divorced but I really don't like this guy. I don't want Wayne really to be with my mom. I'd rather, you know, him and my mom be together—"

Reihl: Mmm hmm.

Monica: "—than my stepdad," kinda thing. That's all I thought it was. So I just really didn't pay no attention to it.

Reihl: Okay. Okay. All right. Well, just so I got this right then, Mandy, you got home at about three thirty, quarter of four and you saw Aaron and his dad and that white truck at his house?

Mandy: Yes.

Reihl: And then, Monica, you got home from cashing that check around four o'clock or a little after, and you saw them both at the house, or at least you saw Aaron?

Monica: Yeah, I saw Aaron.

Reihl: Okay. But you never saw 'em leave.

Monica: No. I was in the house by the time they left.

Reihl: Okay, and Mandy, you did see 'em leave, but you don't know exactly when it was that they left?

Mandy: Yeah. I seen 'em leave, but, you know I didn't see no, I didn't see no bags in the truck. And when, when they left, the clothes were still there.

Reihl: Okay. On the swing?

Mandy: Um, yeah. 'Cause when his grandparents were there, they picked up the clothes and just threw 'em in the box.

Reihl: Okay.

Mandy: And we thought that he was moving, like he didn't like the neighborhood so he was moving. What we thought, and I don't know if it, I didn't know if Rick and Aaron Friday were gonna go look for a new house or go to his mom's. I didn't know, I thought they were going to look for a new house and then come back, and you know, and go. Like, then go to his mom's. But, I didn't, I didn't know.

Reihl: Okay. These times that you've given me today, uh, these are pretty accurate?

Monica: Mmm hmm. Yeah, 'cause I get off work at quarter after three. And with the traffic and that, and sometimes the South Shore comes by and you gotta wait for that.

Reihl: Mmm hmm.

Monica: So, yeah, pretty well.

Reihl: It's pretty much a routine that you do every day?

Monica: Yeah.

Reihl: Every day that you work, that is?

Monica: Yeah. Sometimes on, sometimes I have to stay a couple minutes after, so, I get home a little later. And that was just so happen to have been one of the days that was a little bit later.

Reihl: Okay. All right. I, I don't have any more questions that I can think of at the moment. Do you have anything else that you can think of? Maybe I overlooked, that I have overlooked?

Monica: No. Do you?

Mandy: [Shakes head]

Reihl: I thank you very much for coming down. I'll take you back home now. The time is, uh, three twenty PM. [Pause] I told you that would take you about fifteen, twenty minutes.

Mandy: [Pointing to ceiling] Is that your camera?

Reihl: It's up there.

Mandy: Oh, there it is. I thought it was—it's in that vent right there.